93 Cal.Rptr.2d 703 (2000)
22 Cal.4th 550
994 P.2d 975
Francisco PAZ, Plaintiff and Appellant,
v.
The STATE OF CALIFORNIA et al., Defendants and Respondents.
No. S068742.
Supreme Court of California.
March 20, 2000.
*704 Albert F. Coombes, Encino, for Plaintiff and Appellant.
William M. McMillan, Anthony J. Ruffolo and Lynette G. Chatman, Los Angeles, for Defendants and Respondents State of California and California Department of Transportation.
James K. Hahn, City Attorney, G. Daniel Woodard and Katherine J. Hamilton, Assistant City Attorneys, Lisa S. Berger, Deputy City Attorney, for Defendant and Respondent City of Los Angeles.
Collins, Collins, Muir & Traver, Brian K. Stewart, Pasadena, Tomas A. Guterres and Matthew S. Urbach for Defendant and Respondent Katz, Okitsu & Associates.
Washburn, Briscoe & McCarthy and James P. Corn, Sacramento, for Consulting *705 Engineers and Land Surveyors of California as Amicus Curiae on behalf of Defendant and Respondent Katz, Okitsu & Associates.
Fred J. Hiestand, Sacramento, for the Association for California Tort Reform as Amicus Curiae on behalf of Defendant and Respondent Katz, Okitsu & Associates.
Baraban & Teske, Jeffrey H. Baraban and James S. Link, Pasadena, for Defendants and Respondents Stoneman Corporation and Hugh Temple.
CHIN, J.
This case concerns the duty private contractors owe the general public when they undertake work that might affect an allegedly dangerous condition of public property. Consequently, we consider the negligent undertaking theory of liability articulated in Restatement Second of Torts, section 324A (section 324A), and its application in this context.
As we recently stated in Artiglio v. Corning Inc. (1998) 18 Cal.4th 604, 613, 76 Cal.Rptr.2d 479, 957 P.2d 1313 (Artiglio), the section 324A theory of liabilitysometimes referred to as the "Good Samaritan" ruleis a settled principle firmly rooted in the common law of negligence. Section 324A prescribes the conditions under which a person who undertakes to render services for another may be liable to third persons for physical harm resulting from a failure to act with reasonable care. Liability may exist if (a) the failure to exercise reasonable care increased the risk of harm, (b) the undertaking was to perform a duty the other person owed to the third persons, or (c) the harm was suffered because the other person or the third persons relied on the undertaking. (Artiglio, supra, 18 Cal.4th at pp. 612-613, 76 Cal.Rptr.2d 479, 957 P.2d 1313.)
Here, Francisco Paz (plaintiff) was injured in a traffic accident at an intersection controlled by a single stop sign. He asserted the intersection was dangerous because of obstructed sight lines. The private party defendants were to design and install traffic signals at the intersection as a condition of approval of a new condominium development. They did not obtain the permits necessary to complete the traffic signals' installation until after plaintiffs accident. Plaintiff alleged that they negligently delayed providing the traffic lights that would have negated the intersection's dangerous condition before his accident.
The Court of Appeal majority found that under Biakanja v. Irving (1958) 49 Cal.2d 647, 320 P.2d 16 (Biakanja), the private party defendants owed plaintiff a duty of care as a result of their agreement to provide traffic signals. The court concluded the agreement imposed on them a duty to motorists to install the signals in a reasonable and timely manner, and that their alleged failure to do so allowed the preexisting dangerous condition to contribute to plaintiffs injuries.
We conclude that under the circumstances of this case, defendants did not owe plaintiff a duty simply by undertaking work that may have alleviated an allegedly dangerous condition on public property. A contract for a public project does not create a general duty to third persons that gives rise to negligence liability, with respect to an allegedly dangerous condition the contract work may correct, if the requirements for application of section 324A are not otherwise satisfied.

FACTUAL AND PROCEDURAL BACKGROUND
Plaintiff was injured on January 12, 1991, in an accident at the intersection of Foothill Boulevard and Osborne Street in Los Angeles. He was riding a motorcycle westbound on Foothill Boulevard when he collided with an automobile driven by Lloyd Trafton. Trafton had been traveling southbound on Osborne Street and was turning left onto eastbound Foothill Boulevard. Plaintiff struck Trafton's automobile as Trafton completed his turn.
*706 Osborne Street ends at Foothill Boulevard in a "T" intersection. Near the south side of the intersection is the driveway for a 35-unit condominium project. At the time of the accident, the intersection of Osborne Street and Foothill Boulevard was controlled by a single stop sign on Osborne. Plaintiff alleged that a dangerous condition existed at the intersection because "there was a blind curve obstructing the view of southbound drivers making a left turn from Osborne Street onto Foothill Boulevard so that they could not see traffic headed westbound on Foothill Boulevard. And, vice versa, traffic headed westbound on Foothill Boulevard could not see traffic emerging from Osborne Street."[1]
Defendant Stoneman Corporation was the developer of the condominium project and an eight-house development approved for construction near the intersection.[2] As a condition to obtaining a permit for the condominium project, the City of Los Angeles (City) required that Stoneman install traffic Control signals and modify the roadway striping at the intersection. Stoneman had previously hired Jennings Engineering Company (Jennings), an independent contractor, as the civil engineers for the development project. Jennings in turn hired defendant Katz, Okitsu & Associates (KOA) to design the traffic signals and striping plan and to obtain the permits necessary for installation.
Plaintiff alleged that the governmental entities (the City, the County of Los Angeles, the State of California (State), and the California Department of Transportation (Caltrans)) "knew or should have known that a dangerous condition existed" because "there had been numerous prior accidents reported at that location which had led to a public outcry for some kind of warning device or sign to be placed at said intersection."[3] In his claims against Stoneman, Jennings, and KOA, plaintiff alleged they were aware of the dangerous condition and, as a condition of being allowed to develop the project, they had obligated themselves to provide an operating traffic light signal to remedy the danger. Plaintiff alleged that defendants "so negligently went about the task of providing operating traffic light signals that said signals were not in operation on January 12, 1991, despite the fact that Defendants had made promises to provide the signals at least two years earlier."
The City's department of city planning had approved Stoneman's proposed condominium project in February 1988, subject to various conditions. One condition provided that "prior to recordation, satisfactory arrangements shall be made with the [City's] Department of Transportation to assure that: ... [¶] d. The developer shall pay all costs for the installation of a new traffic signal and modification of existing striping of the intersection of Foothill Boulevard and Osborne Place if determined to be warranted by the Department of Transportation, East Valley District, and the State Department of Transportation (Caltrans)." In a December 1988 letter, Caltrans notified Jennings that it agreed with the City that a traffic signal was warranted, "based on projected traffic volumes" and the existing traffic volumes on both streets. The study underlying Caltrans's conclusion did not find the traffic signal warranted by the intersection's accident *707 experience in the 12-month period reviewed.
Stoneman promptly notified Jennings that it should take the steps necessary to have the signals installed. Early in 1989, Jennings employed KOA under a verbal contract to design the traffic signal and striping plan. The contract had no time-line requirements or deadline for completion. KOA submitted its first plans for the work at the end of May 1989. The City's approval process ran its normal course, and construction began in June 1990. Although KOA's contract with Jennings had no time requirements, KOA experienced some pressure from Stoneman because the traffic signal project was delaying the opening of its development.
On August 24, 1990, Caltrans shut down the project because it had not issued a permit to encroach on the State's right-of-way on Foothill Boulevard or approved the striping plans. At that point, only two more days of work were needed to complete construction of the traffic signals. On September 13, 1990, KOA submitted to Caltrans an application for an encroachment permit on behalf of Stoneman. Caltrans issued its encroachment permit on January 17, 1991, five days after plaintiffs accident. As of November 2, 1990, the City had not applied for its own encroachment permit, which was needed to operate and maintain the signal system. Caltrans did not issue the permit to the City until January 30, 1991.
Walter Okitsu, a partner in KOA, stated that before the Caltrans field engineer stopped the work, KOA thought a Caltrans encroachment permit would not be necessary because Foothill Boulevard was to be transferred from the State to the City. According to Okitsu, Caltrans and the City disagreed on how the intersection should be striped and whether a bicycle lane should be provided. Those disputes had to be resolved before Caltrans would issue its encroachment permit.[4]
KOA and Stoneman moved for summary judgment. KOA argued that it owed no duty to plaintiff and that its failure to apply for the encroachment permit at the outset of the design phase of the project was not negligence. Plaintiff opposed the summary judgment motions by asserting that these defendants owed him a duty as a result of undertaking installation of the traffic signals. The trial court granted the summary judgment motions and entered judgments accordingly.
Plaintiff timely appealed from the judgments for Stoneman and KOA, and the Court of Appeal reversed. The majority held that "one who assumes the task of correcting a dangerous condition has a duty to those exposed to the dangerous condition to do so in a nonnegligent manner...." In the majority's view, defendants' undertakings established a duty of care to plaintiff as a member of a class of persons KOA's contract with Jennings was intended to protect. We granted the petitions for review of KOA and Stoneman.

DISCUSSION
Stoneman's and KOA's motions for summary judgment properly were granted "if all the papers submitted show that there is no triable issue as to any material fact and that [they are] entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) We review the trial court's decision de novo, considering all of the evidence the parties offered in support of and against the motion, and the uncontradicted inferences reasonably deducible from the evidence, except that to which the *708 court sustained objections. (Artiglio, supra, 18 Cal.4th at p. 612, 76 Cal.Rptr.2d 479, 957 P.2d 1313.)
The Court of Appeal recognized that plaintiffs negligence claims involved an initial issue of whether Stoneman and KOA owed him a duty of carea question of law for the court. (See Parsons v. Crown Disposal Co. (1997) 15 Cal.4th 456, 464, 472-473, 63 Cal.Rptr.2d 291, 936 P.2d 70.) The Court of Appeal acknowledged that courts generally consider a number of factors to determine the existence and scope of a duty of care, as epitomized by Rowland v. Christian (1968) 69 Cal.2d 108, 113, 70 Cal.Rptr. 97, 443 P.2d 561. Here, in determining that defendants owed plaintiff a duty of care, the Court of Appeal majority looked to Biakanja, supra, 49 Cal.2d at page 650, 320 P.2d 16, and its analysis of the question of duty in a contractual setting.
The Court of Appeal majority concluded that defendants owed plaintiff a duty of care, primarily because of two factors. The court found that plaintiff was within a class of persons KOA's contract with Jennings was intended to protect. Moreover, the court concluded that defendants could foresee that negligent performance of their contractual obligations might result in injuries arising from the allegedly dangerous condition of the intersection. The court also assumed that even without a deadline for installing the traffic signals, defendants were obliged to do so within a reasonable time, which presented a triable issue of fact. In short, KOA's assumption of contractual obligations that allegedly would correct or alleviate an existing dangerous condition was sufficient for potential liability. Therefore, the Court of Appeal concluded that KOA, and Stoneman as the principal, were under a duty to exercise due care in fulfilling those obligations so as to avoid foreseeable injuries such as plaintiffs.[5]
In this court, plaintiff reiterates his claim that defendants negligently discharged a contractual obligation to install traffic signals. Plaintiff asserts that timely installation of the signals would have alleviated the allegedly dangerous condition of obstructed sight lines at the intersection, and hence prevented his collision with Trafton's car. Thus, plaintiffs claim necessarily is grounded in the negligent undertaking theory of liability articulated in section 324A.
Section 324A reads: "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to [perform][6] his undertaking, *709 if [¶] (a) his failure to exercise reasonable care increases the risk of such harm, or [¶] (b) he has undertaken to perform a duty owed by the other to the third person, or [¶] (c) the harm is suffered because of reliance of the other or the third person upon the undertaking."
The general rule is that a person who has not created a peril is not liable in tort for failing to take affirmative action to protect another unless they have some relationship that gives rise to a duty to act. (Williams v. State of California (1983) 34 Cal.3d 18, 23, 192 Cal.Rptr. 233, 664 P.2d 137.) However, one who undertakes to aid another is under a duty to exercise due care in acting and is liable if the failure to do so increases the risk of harm or if the harm is suffered because the other relied on the undertaking. (Ibid.) Section 324A integrates these two basic principles in its rule.
Thus, as the traditional theory is articulated in the Restatement, and as we have applied it in other contexts, a negligent undertaking claim of liability to third parties requires evidence that: (1) the actor undertook, gratuitously or for consideration, to render services to another; (2) the services rendered were of a kind the actor should have recognized as necessary for the protection of third persons; (3) the actor failed to exercise reasonable care in the performance of the undertaking; (4) the actor's failure to exercise reasonable care resulted in physical harm to the third persons; and (5) either (a) the actor's carelessness increased the risk of such harm, or (b) the actor undertook to perform a duty that the other owed to the third persons, or (c) the harm was suffered because either the other or the third persons relied on the actor's undertaking. (Artiglio, supra, 18 Cal.4th at pp. 613-614, 76 Cal.Rptr.2d 479, 957 P.2d 1313.)
Section 324A's negligent undertaking theory of liability subsumes the well-known elements of any negligence action, viz., duty, breach of duty, proximate cause, and damages. (Artiglio, supra, 18 Cal.4th at p. 614, 76 Cal.Rptr.2d 479, 957 P.2d 1313.) "`The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion. [Citations.] Whether this essential prerequisite to a negligence cause of action has been satisfied in a particular case is a question of law to be resolved by the court.' [Citations.]" (Ibid.) As we recently stated: "To say that someone owes another a duty of care `"is a shorthand statement of a conclusion, rather than an aid to analysis in itself.... `[D]uty' is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." [Citation.]' [Citation.] `[L]egal duties are not discoverable facts of nature, but merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done.' [Citation.]" (Hoff v. Vacaville Unified School Dist. (1998) 19 Cal.4th 925, 933, 80 Cal.Rptr.2d 811, 968 P.2d 522.) The conditions for liability articulated in section 324A represent just such a conclusion.
In assessing the applicability of section 324A here, we assume for the sake of discussion that defendants undertook the tasks they are alleged to have performed negligently. As we said in Artiglio, supra, 18 Cal.4th at page 614, 76 Cal.Rptr.2d 479, 957 P.2d 1313, "`The foundational requirement of the good Samaritan rule is that in order for liability to be imposed upon the actor, he must specifically have undertaken to perform the task that he is charged with having performed negligently....'" Similarly, we assume that defendants' agreement to install traffic control signals for the City constituted an undertaking "to render services to another which [defendants] should recognize as necessary for *710 the protection of [third persons]...." (§ 324A.)
However, the negligent undertaking theory of liability requires more than simply establishing defendants' undertaking to another. Under section 324A, liability depends on whether: (a) defendants' failure to exercise reasonable care increased the risk of physical harm to the third person; or (b) defendants undertook to perform a duty the other owed to the third person; or (c) the harm was suffered because the other or the third person relied on defendants' undertaking. (§ 324A; Artiglio, supra, 18 Cal.4th at p. 614, 76 Cal.Rptr.2d 479, 957 P.2d 1313.)
In this case, none of these three conditions for section 324A liability are present. The evidence fails to support an inference that defendants' conduct increased the risk of physical harm to plaintiff beyond that which allegedly existed at the intersection.[7] Plaintiff alleged that the intersection was dangerous because of restricted sight lines. However, nothing in the record suggests that defendants did anything that increased the risk to motorists that allegedly existed because of these sight lines. Instead, defendants simply did not succeed in completingbefore plaintiffs collisiona project that might have reduced the preexisting hazard at the intersection. In this instance, where the record shows that nothing changed but the passage of time, a failure to alleviate a risk cannot be regarded as tantamount to increasing that risk.
In that regard, this case bears some parallels with Thirion v. Fredrickson & Watson (1961) 193 Cal.App.2d 299, 14 Cal. Rptr. 269. The plaintiff there was injured after his car drove across wet gravel, skidded off the highway, and hit a tree. (Id. at pp. 301-302, 14 Cal.Rptr. 269.) Justice Tobriner, writing for the Court of Appeal on which he then sat, stated: "[W]e cannot believe that a contractor who agrees to reconstruct a highway becomes liable for an injury caused by a preexisting depression on the highway within the area of the project but outside the area where he has worked. On the other hand, a jury could infer negligence on the part of the contractor, and proximately caused injury, from the deposit of wet loose gravel on that part of the highway upon which the contractor had not yet undertaken construction." (Id. at p. 301, 14 Cal.Rptr. 269.) The court reasoned that to charge contractors with responsibility for preexisting defects would expose them to potential liability for the condition of the entire project area from the moment they undertook the work. (Id. at p. 307, 14 Cal.Rptr. 269.) Thus, Thirion, by finding liability for neglect that increased the dangers to which the public was exposed, but precluding liability for not correcting a previously existing hazard, reflects the principles articulated in section 324A.
Neither the record nor the law shows any basis for satisfying the second alternative condition required for section 324A liability. In agreeing to the traffic signal installation condition, Stoneman (and by extension KOA) did not undertake to perform a duty that the City owed to plaintiff. As our cases and statutes establish, cities generally have no affirmative duty to install traffic control signals. (Mittenhuber v. City of Redondo Beach (1983) 142 Cal.App.3d 1, 6, 190 Cal.Rptr. 694; see Gov.Code, § 830.4.) Nothing in *711 this record suggests any reason for departing from that rule.
Finally, plaintiff did not submit, and the record does not contain, any evidence that he was harmed because either he or the City relied on defendants' timely installation of traffic control signals. The only reasonable inferences available from the record are to the contrary. The City and Stoneman did not make a contract to install the traffic signals. Instead, the City only made the signals a condition of Stoneman's condominium development project. If Stoneman had abandoned the development projecta decision that real property developers may face if financing becomes uncertain or if litigation entangles a projectStoneman would not have been obliged to install the traffic signals at all. Thus, imposing the traffic signal installation as a condition of development did not give the City a basis for relying on the installation's being completed at any time before the condominium project's completion.
The fact that the City was not relying on defendants to complete traffic signal installation within any particular time is further demonstrated by the City's own conduct in the matter. The uncontradicted evidence showed that the City's disagreements with Caltrans over traffic striping issues delayed issuance of KOA's encroachment permit. Furthermore, the City did not apply for its own encroachment permit, necessary to operate and maintain the signals, for more than two months after Caltrans stopped KOA's work on the project just days before it would have been completed.
In sum, none of the three alternative conditions to liability under section 324A are satisfied here. As a result, the considerations and policy interests that are embodied in the negligent undertaking theory of section 324A preclude defendants' liability. In performing their undertaking with the City, defendants did not increase the hazards to which motorists were exposed as a result of the preexisting conditions at the intersection. The defendants did not undertake a duty the City owed to motorists such as plaintiff. Nor is there any evidence that any reliance by the City, much less by the plaintiff, resulted in plaintiffs injury. Consequently, under the established principles of our common law of negligence as reflected in section 324A, the trial court properly granted summary judgment for Stoneman and KOA.

DISPOSITION
For the foregoing reasons, the judgment of the Court of Appeal is reversed and the cause remanded with directions to enter judgment in favor of defendants Stoneman and KOA.
KENNARD, J., BAXTER, J., WERDEGAR, J., and BROWN, J., concur.
Concurring Opinion by MOSK, J.
I agree with the majority that defendants owed no duty towards plaintiff in this case. As the majority correctly state: "[T]he City was not relying on defendants to complete the traffic signal installation within any particular time...." (Maj. opn., ante, 93 Cal.Rptr.2d at p. 711, 994 P.2d at p. 982.) Stated another way, nothing in the record establishes that by failing to install the traffic signal by January 12, 1991, when the accident occurred, the developer or its agents breached any legal duty contractually imposed or otherwise. This is therefore not a case in which a developer breached an obligation to install traffic improvements before commencing the operation of a commercial or residential development. Under such circumstances, a municipality may be said to rely upon a developer's timely installation of the traffic signal, and the developer could accordingly be held liable for harm resulting from its negligent delay based on that reliance. (Rest.2d Torts, § 324A, subd. (c).) Thus, I do not understand the majority as foreclosing liability for negligent delay when a developer has breached a legal *712 obligation to install a traffic improvement by a certain time or under a certain condition.
Dissenting Opinion by GEORGE, C.J.
I respectfully dissent.
In my view, when a developer, as a condition of obtaining a development permit, agrees to install a safety measure for the protection of the public and proceeds to develop the property under the auspices of the permit, the developer owes a legal duty of due care to the members of the public for whose protection the safety measure is intended, and may be held liable if its negligent failure to comply with its obligation under the permit condition is a proximate cause of an injury to a person within the protected class. Contrary to the conclusion reached by the majority, I believe the general principles embodied in section 324A of the Restatement Second of Torts (section 324A) support the imposition of liability upon a developer under these circumstances.

I
As the majority recognizes, under section 324A a person "who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person ..., is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to [perform] his undertaking, if [¶] (a) his failure to exercise reasonable care increases the risk of such harm, or [¶] (b) he has undertaken to perform a duty owed by the other to the third person, or [¶] (c) the harm is suffered because of reliance of the other or the third person upon the undertaking."
The majority appears to acknowledge that a developer that agrees to install a traffic signal at an intersection as a condition of obtaining a development permit satisfies the initial requirements of section 324A: by undertaking to install a traffic signal, the developer should recognize that the signal is intended for the protection of third persons, i.e., the members of the public who use the intersection and are subjected to the risks that the traffic signal is intended to alleviate. The majority concludes, however, that none of the three additional alternative conditions or circumstances set forth in the concluding portion of section 324A are satisfied in this case  i.e., the majority concludes that (1) the developer's alleged negligent delay in installing the signal did not increase the risk of harm posed by the intersection, (2) the developer, in agreeing to install the signal, did not undertake to perform a duty owed by the city to the plaintiff, and (3) there was no reliance upon the developer's undertaking. As I shall explain, I conclude that two of the three alternative conditions set forth in section 324A support a determination that the developer owed a duty of care to plaintiff.

A
To begin with, unlike the majority I believe that the developer, in agreeing to install a traffic signal at the intersection of Foothill Boulevard and Osborne Street, reasonably could be found to have undertaken to perform a duty that the city owed to the users of the intersection to alleviate a dangerous condition at the intersection, thus supporting liability of the developer under the second condition set forth in 324A.
Under Government Code section 835, subdivision (b), a public entity may be held liable for an injury caused by a "dangerous condition" of its property if the public entity "had actual or constructive notice of the dangerous condition ... a sufficient time prior to the injury to have taken measures to protect against the dangerous condition." As the majority notes, however, Government Code section 830.4 provides that "[a] condition is not a dangerous condition within the meaning of this chapter merely because of the failure to provide regulatory traffic control signals" (italics added), and thus it follows that the *713 city's liability under section 835 may not be posited solely upon the city's failure to provide a traffic control signal. (See, e.g., Mittenhuber v. City of Redondo Beach (1983) 142 Cal.App.3d 1, 6, 190 Cal.Rptr. 694; see generally 2 Cal. Government Tort Liability Practice (Cont.Ed.Bar 4th ed.1999) § 12.75, pp. 801-804.)
Nonetheless, as the court explained in Washington v. City & County of San Francisco (1990) 219 Cal.App.3d 1531, 1534-1535, 269 Cal.Rptr. 58, "[c]ases interpreting [Government Code section 830.4] have held that it provides a shield against liability only in those situations where the alleged dangerous condition exists solely as a result of the public entity's failure to provide a regulatory traffic device or street marking. If a traffic intersection is dangerous for reasons other than the failure to provide regulatory signals or street markings, the statute provides no immunity." (First italics in original, second italics added; see also Hilts v. County of Solano (1968) 265 Cal.App.2d 161, 174, 71 Cal.Rptr. 275; see generally 2 Cal. Government Tort Liability Practice, supra, § 12.75, p. 802.)
On the basis of the record before us, a trier of fact reasonably could find that the intersection at Foothill Boulevard and Osborne Street constituted a dangerous condition not merely because of the absence of a traffic signal but because of the configuration and restricted sight lines of the intersecting streets, the permissible speed limit on Foothill Boulevard, and the increase in traffic on Foothill Boulevard over time, and because the city was aware of a number of serious accidents and near-misses that had occurred at the intersection in the years preceding the accident here in question. If the trier of fact so found, the city would have a legal duty to alleviate the dangerous condition at the intersection, and the developer, in agreeing to install a traffic signal at the intersection, would have undertaken one permissible means of satisfying the city's legal duty to eliminate the dangerous condition. Under such circumstances, the developer would be subject to liability because it undertook to perform a duty owed by the city to the users of the intersection. (See Schmeck v. City of Shawnee (1982) 232 Kan. 11, 651 P.2d 585, 596-599 [affirming judgment against company hired to install traffic signal, relying in part upon §324A in rejecting claim that company owed no duty to members of the public who used the intersection].)

B
Second, whether or not a duty on the part of the developer may be based upon the second condition of section 324A, I believe the developer owed a duty to the users of the intersection under the third condition of section 324A, because in these circumstances the city (and the neighborhood residents who repeatedly had lobbied the city for the installation of a traffic signal at the intersection) reasonably relied upon the developer's undertaking to install the traffic signal.[1]
As the opinion recounts, in this case local and state transportation authorities concluded in December 1988, more than two years prior to the date of plaintiffs accident, that in view of the conditions of the intersection and increasing traffic use, as well as the numerous accidents that had occurred at the location, a traffic signal should be installed at the intersection in question, triggering the developer's obligation under the permit to install the signal. The record also discloses that the *714 decisions by the transportation authorities came after local residents had lodged many complaints about the dangerousness of the intersection and had engaged in extensive lobbying for such a traffic signal. Because the developer in this case agreed to install the traffic signal as a condition of its development permit and proceeded to develop the property and to hire contractors to install the traffic signal, it is reasonable to conclude that both the city and the public relied upon the developer's undertaking and, because of such reliance, did not seek to have either the city itself or some other developer install the needed traffic signal. Indeed, a declaration filed by a board member of the local homeowners association states that she personally informed the developer of the homeowners' concern over the dangerous intersection and of the need to have the traffic signal in place and operational as soon as possible, and a number of articles in a neighborhood newsletter, which also are included in the record, confirm that the residents of the neighborhood very clearly relied upon the developer to install the traffic signal. Further, the contractor in charge of the traffic signal project acknowledged in his deposition that he was aware that there was pressure from the local homeowners to complete the installation.
Although the development permit did not set a specific deadline for the installation of the signal, it is well established, under generally applicable legal principles, that in the absence of the recitation of a specified date a provision is to be interpreted to require performance within a reasonable period of time. (See, e.g., Civ.Code, § 1657.) In this case, more than two years elapsed between the date the developer was informed that a traffic signal was required and the date of plaintiffs accident. Under these circumstances, a trier of fact reasonably could determine that the more than two-year delay in the installation of the signal exceeded a reasonable period of time, and that the accident was caused, at least in part, by the developer's failure to comply with the permit condition.
The majority assert's that "the City was not relying on defendants to complete the traffic signal installation within any particular time" (maj. opn., ante, 93 Cal.Rptr.2d at p. 711, 994 P.2d at p. 714), suggesting that the developer could have delayed the installation of the traffic signal indefinitely without incurring any liability for the dangerous condition that would have persisted throughout such delay. Once a developer has made a commitment to install a needed safety measure as a condition of obtaining a development permit and goes ahead with work under the permit, however, the local entity and the public reasonably anticipate that the safety measure in question will be provided by the developer within a reasonable period of time. Thus, under these circumstances the public entity would have no reason to expend its own funds or to seek to impose a similar requirement upon some other entity, absent some indication from the developer that it does not intend to fulfill its responsibility under the permit. For this reason, when a developer agrees to provide a safety measure as a condition of obtaining a permit and proceeds to develop the property under the permit, I believe that, under the principles embodied in section 324A, the developer may be held liable if, as a result of its negligence, it fails to provide the safety measure in a timely manner, and such failure is a proximate cause of an injury to a member of the public for whose protection the safety measure was intended.
Further, if the developer owed a legal duty to plaintiff to use due care to provide the safety measure it had agreed to install (as I have concluded, for the reasons just discussed), it also follows, under section 324A, that the contractor hired by the developer specifically to design and install the safety measure also may be held liable if its negligence in failing to perform its obligations under the contract in a timely manner was a proximate cause of plaintiffs injuries.

*715 II
The narrow question before us in this proceeding is simply whether the developer and its contractor are entitled to summary judgment on the theory that they owed no legal duty to plaintiff. Were this matter to go to trial, a jury could find either that these defendants were not negligent because the installation of the traffic signal was not unreasonably delayed or that, even if these defendants were negligent, such negligence was not a proximate cause of plaintiffs injuries. Further, a jury also could find that plaintiff himself or another defendant or defendants, rather than the developer or its contractor, should bear the major share of responsibility for the injuries. In my view, however, it is improper to conclude that a developer that agrees to install a safety measure as a condition of obtaining a permit owes no duty of care to the class of persons the safety measure is intended to protect, and that the contractor hired by the developer similarly owes no duty of care to those persons.
Accordingly, I would affirm the judgment of the Court of Appeal, which reversed the summary judgment entered in favor of defendants developer and contractor.
NOTES
[1] Trafton testified that he did see plaintiff's motorcycle approaching the intersection "some distance down the street" and "coming fast." Trafton nevertheless thought he could safely make his left turn. Plaintiff had no recollection of the events after he went around the curve and saw the intersection.
[2] Another defendant in this action, Hugh Temple, is the president of Stoneman Corporation (collectively Stoneman).
[3] Plaintiff's expert witness, a civil engineer and traffic engineer, based his opinion of the intersection's safety on, among other things, his review of the City's history of accidents reported at that location. He noted nine accidents, including plaintiff's, between May 1, 1986, and April 30, 1991. He also noted that of those nine, "there were six accidents [at the intersection] in 1988 and 1989...."
[4] James Knox of Caltrans testified that the State would not have installed these signals. Further, the State did not want any responsibility for maintaining and timing the signals because Foothill Boulevard was going to become a City street in the near future. Caltrans allowed the signals to be installed provided the City assumed full responsibility for their maintenance. However, the transfer of Foothill Boulevard had not been effected. Caltrans required the City, as well as KOA, to obtain an encroachment permit to operate and maintain the signals before they could become operational.
[5] The dissenting Court of Appeal justice came to a different conclusion after examining the considerations noted in Rowland v. Christian, supra, 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561, and distinguishing Biakanja, supra, 49 Cal.2d 647, 320 P.2d 16. The dissent concluded that while it was foreseeable that defendant's delay in obtaining the Caltrans encroachment permit could cause some delay in the project, it was not foreseeable that the delay would last for months or cause the type of injuries plaintiff sustained. Similarly, the dissent found no close connection between the delayed permit application and plaintiff's injuries. The dissent assigned no moral blame to the untimely permit application because nothing showed that defendants deviated from a standard of care the law imposed on their businesses. Because defendants' activities were limited and did not cause plaintiff's injuries, the dissent noted that defendants were not in a position to prevent future harm. Although the burden on public works contractors of promptly applying for permits would be relatively modest, the dissent stated that an expansion of their duty to third parties would have disproportionate social and economic costs as they faced new liability claims for delays and errors they neither caused nor could control. Consequently, the dissent found that policy considerations weighed against imposing on defendants a duty to plaintiff.
[6] The published text of section 324A uses "protect" rather than "perform." We previously have observed that the published text apparently reflects a typographical error on that point. (Artiglio, supra, 18 Cal.4th at p. 613, fn. 4, 76 Cal.Rptr.2d 479, 957 P.2d 1313.)
[7] Plaintiff claims that his traffic engineering expert's declaration establishes that defendants increased the intersection's risk level because of the condominium driveway on the south side of Foothill Boulevard. However, plaintiff submitted no evidence that this driveway contributed in any manner to his collision. Moreover, even plaintiff's expert stated that the driveway, and other factors, "do not make the intersection dangerous in itself but do add to the number of distractions facing a driver stopped at the limit line on Osborne Street...." Trafton stated, however, that before he entered the intersection, he saw plaintiff approaching on his motorcycle. Thus, plaintiff's expert's declaration fails to raise any inference that the condominium driveway increased the risk to plaintiff.
[1] Although there is no evidence in this case that plaintiff was aware of, or relied upon, the developer's commitment to install a traffic signal, under section 324A the relevant reliance may be either by the injured person or by the entity for which the developer undertakes to render the service, here, the city. The comment to section 324A states in this regard that "[w]here the reliance of the [city] ... has induced [it] to forgo other remedies or precautions against such a risk, the harm results from the negligence as fully as if the actor had created the risk." (Rest.2d Torts, § 324A, com. e, p. 144.)