Filed 12/11/24; Certified for Publication 1/8/25 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| DENISE COLLINS et al., | |
|    Plaintiffs and Respondents, | G062752 |
|      v. | (Super. Ct. No. PSC1901096) |
| DIAMOND GENERATING CORPORATION, | O P I N I O N |
|    Defendant and Appellant. | |

Appeal from a judgment and postjudgment orders of the Superior Court of Riverside County, Manuel Bustamante, Jr., Judge. Reversed and remanded with directions. Request for judicial notice denied.

Horvitz & Levy, Stephen E. Norris, Mark A. Kressel, and John B. Sprangers; Schumann Arevalo, Kim Schumann, David P. Reid, and Jeffrey P. Cunningham for Defendant and Appellant.

Sullivan, Rivera, Osuna & Sullivan, David C. Sullivan; the Basile Law Firm, J. Jude Basile; the Ehrlich Law Firm and Jeffrey I. Ehrlich, for Plaintiffs and Respondents.

\*　　\*　　\*

Sentinel Energy Center, LLC (Sentinel) owns a power plant in North Palm Springs, and it hired DGC Operations, LLC (OPS) in 2011 to manage and operate the plant. In 2017, five OPS employees were performing annual maintenance at one of the units at the plant, a process which required them to depressurize the unit's fuel filter skid so the filter could be changed. OPS had recently changed the protocol for depressurizing the skid but had not provided adequate training to its employees on the process, and all five OPS employees working on the project failed to follow the prescribed protocols for depressurization. When one of the employees, Daniel Collins, attempted to remove the lid of the fuel filter tank, the system was still under extreme pressure, and Collins was killed in the resulting explosion.

This appeal concerns whether Collins's surviving family members (Plaintiffs) can maintain a claim against appellant Diamond Generating Corporation (DGC). DGC has a 50 percent indirect ownership interest in Sentinel (the plant owner and the entity that hired OPS); it is also the parent company of OPS. For a number of years, DGC executives supervised OPS's plant manager, the individual who was in charge of training (and failed to train) OPS employees on plant safety.

Plaintiffs tried their case against DGC on a negligent undertaking theory, asserting that DGC undertook a duty to render

2

"safety-related services" at the Sentinel power plant by overseeing OPS's work, and that DGC's failures in safety oversight led directly to Collins's death. The jury agreed, determined DGC was 97 percent at fault, and awarded Plaintiffs over $150 million.

On appeal, DGC asserts Plaintiffs' claims are barred by *Privette v. Superior Court* (1993) 5 Cal.4th 689 (*Privette*) and its progeny. The *Privette* doctrine provides that the hirer of an independent contractor presumptively delegates responsibility for workplace safety to the contractor and thus is not liable for on-the-job injuries to the contractor's workers, unless (1) the hirer withholds critical safety information, or (2) the hirer retains partial control over part of the work and negligently exercises that retained control in a way that affirmatively contributes to the worker's injury.

DGC maintains the *Privette* doctrine shields it from liability because, as a partial indirect owner of Sentinel, DGC presumptively delegated any responsibility it had over worker safety through Sentinel to OPS. Sentinel, the plant owner, hired and contracted with OPS, Collins's employer, to handle all safety matters at the plant, and in doing so, Sentinel both expressly (as a matter of contract) and presumptively (under *Privette*) delegated safety responsibilities to OPS. DGC contends that as an indirect partial owner of Sentinel, it is entitled to the same protection under *Privette*.

DGC asked the trial court to instruct the jury on the *Privette* doctrine; the court refused, finding the doctrine inapplicable. DGC also relied on *Privette* in moving for nonsuit and for judgment notwithstanding the verdict; again, the court found the doctrine inapplicable. In this appeal, DGC asserts it was entitled to judgment notwithstanding the verdict, or in the alternative, that we should order a new trial based on the court's prejudicial refusal to instruct the jury on *Privette*.

3

We decline to hold that, pursuant to *Privette*, DGC is entitled to judgment notwithstanding the verdict. The record before us presents too many factual questions to support such a ruling; the issues relate particularly to whether DGC retained partial control over the Sentinel plant and negligently exercised that retained control in a way that affirmatively contributed to Collins's death.

However, we conclude the trial court prejudicially erred in refusing to instruct the jury on the *Privette* doctrine and its exceptions. Such instructions were warranted by substantial evidence, and the trier of fact could reasonably have reached a result more favorable to DGC in the absence of the error. Accordingly, we reverse the judgment and remand this matter for a new trial.

STATEMENT OF FACTS[1]

We begin with discussion of the various entities involved in the ownership and operation of the power plant. The plant, which is owned by Sentinel, is a high-pressure natural-gas electrical-power generating plant, the largest plant of its kind in the world. It became operational in 2013 and uses eight gas-burning turbines, or "units," to generate power.

DGC has an indirect 50 percent ownership interest in Sentinel through its partial ownership of several holding companies. DGC is also in the business of building and operating power plants; it owns and operates three other plants in California—one in Larkspur, another in Indigo, and a third in Mariposa.

---

[1] This is a complex appeal from a jury trial that lasted several weeks. The appellate briefs collectively total nearly 300 pages, and the record on appeal is nearly 4,000 pages in length. We commend counsel for providing a comprehensive summary of the facts in their briefing.

In 2011, before the plant became operational, Sentinel opened a competitive bidding process to hire a plant operator and interviewed a number of companies for the job. OPS, which is a subsidiary of DGC, and which is in the business of operating and maintaining power generation facilities, won the contract and was selected by Sentinel to oversee the day-to-day operations and maintenance of the plant.

After OPS won the bid, Sentinel and OPS entered into an Operation and Maintenance Agreement (the O&M Agreement) through which Sentinel expressly delegated to OPS all responsibility for the power plant's day-to-day operations. Among other things, the O&M Agreement required OPS to develop plant policies and procedures, implement a health and safety program that included periodic safety audits, and provide employee training.

In 2012, while the power plant was still under construction, DGC executives interviewed and hired Tom Walker to serve as plant manager. Walker was at all times an OPS employee. As plant manager, Walker was responsible for, among other things, ensuring compliance with the O&M Agreement, directing OPS's work force in the day-to-day operations and maintenance of the plant, and ensuring OPS employee safety.

After Walker was hired, DGC (which, as noted, is OPS's parent company and a partial indirect owner of Sentinel) remained involved in supervising Walker's work, including his performance as to plant safety. During the first four years of Walker's employment with OPS—that is, from 2012 through August 2016—Walker reported to DGC executives, and those executives conducted Walker's annual performance reviews, which included a category on plant safety. Walker sent DGC daily reports on the plant's turbines, which included any safety concerns. Although Walker stopped

5

reporting to DGC executives in August 2016, he continued to attend quarterly meetings with DGC executives and other plant managers at DGC headquarters in Los Angeles.

Walker's job duties included, among other things, training OPS employees on safety protocols to follow during annual maintenance at the plant. Once a year, each of the eight units at the plant is shut down so that OPS employees and a crew of independent contractors can perform a series of maintenance tasks on each unit.

To prevent an unexpected energization, start-up, or release of stored energy during such maintenance, federal regulations require power plants like the Sentinel plant to develop a lockout/tagout (LOTO) procedure for use during equipment maintenance. (29 C.F.R. § 1910.147(a)(3)(i) (2024).) OPS was responsible for creating, implementing, and maintaining all LOTO procedures.

The LOTO procedure that OPS adopted for the power plant was known as Procedure SMP-3 (the SMP-3). Among other things, the SMP-3 specifies how LOTO procedures must be performed, who can perform them, and how those individuals must be trained.

Walker and OPS Operations Manager Jason King drafted the SMP-3 in 2013 using sample LOTO policies provided by DGC from its other facilities. The SMP-3 bears the OPS logo on every page.

The SMP-3 does not include specific steps for performing maintenance of a given set of equipment. Those are instead provided on the equipment's "LOTO sheet," which includes a step-by-step checklist for the

6

safe shutdown, de-energization, and securing of equipment and systems during maintenance. Unlike the SMP-3, the LOTO sheets bore DGC's logo.[2]

The SMP-3 required Walker, as plant manager, to ensure all personnel are trained on the LOTO procedures, both annually and whenever there was a change in the LOTO procedure. Walker was also required to prepare annual LOTO program audits and either prepare or oversee the preparation of monthly audits. He did neither.

Walker provided limited training on the LOTO procedure. An initial 3-hour training was given in 2013, but no training on LOTO was conducted for new hires in 2014 or 2015. Certain computer trainings given in January 2016 and January 2017 touched on LOTO, but no hands-on trainings were ever conducted in the field. In the absence of any formal training, OPS employees relied heavily on institutional knowledge gathered by shadowing other employees.

Walker failed to comply with his LOTO audit responsibilities. While some monthly audits were conducted, the vast majority were deficient. Walker never performed the mandatory annual LOTO audits.

Despite these deficits in Walker's safety-related performance, DGC executives consistently gave Walker positive reviews from 2012 to 2016, along with bonuses and increases in his compensation. The positive feedback from DGC led Walker to conclude he was doing a good job.

In August 2016, Walker stopped reporting to DGC executives and instead began reporting to Adam Christodoulou, who was hired to serve as

---

[2] Walker claimed he used the DGC logo because he thought it looked nice.

OPS's General Manager. Christodoulou took over Walker's annual reviews as well.

Even so, DGC continued to exert oversight as to plant safety. In fall 2016, for example, DGC executives reviewed OPS's proposed changes to certain plant safety and procedure manuals (none of which concerned the LOTO procedures or the SMP-3). Additionally, in January 2017, DGC executives held a quarterly meeting with Walker and other OPS managers at DGC's corporate offices in Los Angeles to discuss a variety of topics. One of the scheduled topics was an update on safety procedures, though it is unclear from the record whether that was discussed.[3]

The accident at issue here occurred in March 2017 when a group of OPS employees were servicing a fuel filter skid related to the annual maintenance of unit 5. Each unit at the Sentinel plant is equipped with a fuel filter skid, which processes high pressure gas from the pipeline and filters out any particulate matter or liquids before the gas is combusted in the turbine. The fuel filter skid includes a seven-foot tall tank with filters, which are inspected and changed during the annual maintenance. That process requires removing the tank lid, which is bolted to the top of the tank; the lid weighs more than 100 pounds.

From the plant's opening through the end of 2016, the LOTO sheet for servicing the fuel filter skid required the crew to depressurize it by

---

[3] Plaintiffs assert that a "DGC executive" also exchanged a series of e-mails with Walker between August and November 2016 concerning the development of safety training and assert that Christodoulou is a DGC executive. But the individual who sent those communications was Adam Christodoulou, and multiple witnesses testified that Christodoulou was employed by OPS. Christodoulou's e-mail address ended in @dgc-ops.com, not @dgc-us.com like e-mail addresses of DGC's executives.

first closing isolation valve number one (which prevented gas in the pipeline from entering the fuel filter tank), then closing isolation valve number two (which isolated the fuel filter tank from the gas-supply system and prevented high-pressure gas from flowing back from the turbine into the filter tank), and then opening two valves to vent the tank. This process released the gas trapped in the tank, reducing its energy state to zero and ensuring the tank was safe for maintenance. Complete depressurization of the fuel filter system was important because that system had a standing pressure of up to 900 pounds per square inch.

A few months before the accident, in January 2017, OPS gas turbine technician Robert Ward proposed certain changes to the LOTO sheet which he believed would make the process safer. OPS Operations Manager Jason King approved the changes, which included moving the step for closing isolation valve number two to later in the sequence. After receiving King's approval, Ward discussed the changes with Collins and the other OPS technicians, all of whom agreed the changes should be made. It is unclear whether DGC was made aware of these changes.

Although OPS technicians discussed the change to the LOTO sheet, no training on the new procedure was provided. OPS employees used the new sequence several times without issue in the two-month period after its creation.

On March 6, 2017, a group of five OPS employees—Collins, Ward, King, Mike Delaney, and Albert Palalay—prepared to service the fuel filter skid of unit 5 as part of its annual maintenance. During their morning meeting, Ward provided the team with the recently revised LOTO sheet, and he reminded Collins several times that the act of closing isolation valve number two had been moved to later in the LOTO sequence.

Each OPS employee had a different function to perform under the SMP-3 to ensure the work was done safely: the "installer" (Collins) was to install the LOTO by following the steps on the LOTO sheet in the specified order; the "verifiers" (Delany and Palalay) were to confirm the LOTO was installed correctly; and the "work supervisor" (King) was to verify all required procedures were followed and that the fuel filter skid had been depressurized. Evidence presented at trial indicated none of those things happened.

Apparently, Collins (the installer) did not perform the steps in the order listed on the LOTO sheet, closing isolation valve number two at an earlier time than indicated on the LOTO sheet. As a result, dangerous gas pressure remained in the system.

Delaney and Palalay (the verifiers) failed to independently confirm Collins's work. In fact, Palalay was not yet trained to serve as a verifier, and both men later admitted they did not understand how the system worked.

Throughout the morning, the workers heard gas venting, which indicated that dangerous stored energy remained in the system. Although the SMP-3 required King (the work supervisor) to remove all workers from the area if there was an indication of a reaccumulation of stored energy, King declined to do so because Collins repeatedly assured him that the process was under control and that the system had been depressurized.

The SMP-3 required Collins to verify that the system had been depressurized before removing the tank's lid; he could have done so by checking a pressure gauge located on the filter tank. Neither Collins nor anyone else verified that the system had been depressurized. King, who as work supervisor was required to verify depressurization, did not do so.

10

At about 11:00 a.m., when Collins attempted to unbolt and remove the lid on the fuel filter tank, it was still pressurized to 700 pounds per square inch. As a result, the lid blew off with enough force to propel it 150 yards away. The explosion killed Collins. No DGC employees were present when the accident occurred.

PROCEDURAL HISTORY

Collins's surviving wife and adult son (collectively, Plaintiffs) filed a complaint against Sentinel and others for negligence and wrongful death, and they later amended the complaint to add other defendants. By the time of trial, Plaintiffs had settled their claims against most defendants; their sole remaining claim was against DGC for negligent undertaking.[4]

Before and during trial, DGC argued Plaintiffs' claim was barred by the *Privette* doctrine, because Sentinel (of which DGC is an indirect partial owner) hired OPS to run the plant and delegated to OPS all responsibility for day-to-day plant operations. DGC proposed jury instructions based on *Privette*. It also relied on *Privette* in moving for nonsuit.

Rejecting DGC's arguments, the trial court denied DGC's nonsuit motion and refused to instruct on *Privette*. The court reasoned that *Privette* applies only where the defendant hires a contractor to do a single job, such as

---

[4] "Under [the negligent undertaking] doctrine, a defendant who undertakes to render services to another may owe a duty of care either to the other person or to a third person." (*Barenborg v. Sigma Alpha Epsilon Fraternity* (2019) 33 Cal.App.5th 70, 83.) Sometimes referred to as the "Good Samaritan rule," the doctrine provides that one who undertakes to aid another, despite having no initial duty to do so, has a duty to exercise due care in providing such aid and is liable if the failure to do so increases the risk of harm or if the harm is suffered because the other relied on the undertaking. (*Paz v. State of California* (2000) 22 Cal.4th 550, 558-559; *Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 613.)

11

a homeowner hiring a contractor to build a pool; because DGC (a partial owner of the hirer) was also the parent company of OPS (the contractor), and because OPS was running day-to-day operations rather than completing a single task, the court found *Privette* does not apply.

After deliberations, the jury awarded Plaintiffs $150 million in noneconomic damages; it allocated 97 percent of the fault to DGC, 2 percent to OPS, and 1 percent to Collins. DGC moved for judgment notwithstanding the verdict and a new trial, arguing (among other things) it was entitled to judgment in its favor based on *Privette*. The trial court rejected that argument.

After further proceedings concerning the amount of damages, Plaintiffs agreed to accept a remittitur to $104 million in lieu of a new trial on damages. After accounting for setoffs and the 3 percent fault allocated to Collins and OPS, the trial court entered a judgment for Plaintiffs and against DGC in the amount of $100,340,000 in noneconomic damages, $96,383.20 for costs, and prejudgment interest under Civil Code section 3291.

## DISCUSSION

The *Privette* doctrine provides that, subject to certain exceptions, "a hirer is typically not liable for injuries sustained by an independent contractor or its workers while on the job." (*Gonzalez v. Mathis* (2021) 12 Cal.5th 29, 41 (*Gonzalez*).) Although here the hirer of the contractor (OPS) was Sentinel, not DGC, DGC maintains it is entitled to *Privette's* protections as a partial indirect owner of Sentinel, and the trial court erred in denying its motion for judgment notwithstanding the verdict under *Privette*. DGC alternatively contends the trial court erred by refusing to instruct the jury on the *Privette* doctrine, and that this error was prejudicial because the jury in

12

all reasonable probability would have likely found DGC not liable had it been given the opportunity to apply *Privette*. We review both arguments de novo.[5]

We begin with an overview of *Privette* and its progeny. The *Privette* rule—the notion that a hirer is not liable for on-the-job injuries to an independent contractor's employee—was initially based on the availability of workers' compensation to compensate the contractor's employees for work-related injuries. (*Privette, supra,* at 5 Cal.4th at pp. 692, 699.) The *Privette* court explained that "allow[ing] an independent contractor's employees who incur work-related injuries compensable under the workers' compensation system to also seek damages under the doctrine of peculiar risk from the person who hired the contractor would give those employees an

---

[5] "When a trial court denies a motion for [judgment notwithstanding the verdict], the applicable standard of review depends on the type of issue raised on appeal. [Citation.] When an appellant challenges the sufficiency of the evidence in support of the jury's factual findings, the substantial evidence standard of review applies. [Citation.] Alternatively, when a challenge raises purely legal issues, the independent standard of review applies." (*TRC Operating Co., Inc. v. Chevron USA, Inc.* (2024) 102 Cal.App.5th 1040, 1102, review granted Sept. 25, 2024, S286233.) In this case, DGC's arguments concerning the applicability of the *Privette* doctrine raise a legal issue, so our review of the order denying judgment notwithstanding the verdict is de novo.

As for the alleged instructional error, "'The propriety of jury instructions is a question of law that we review de novo. [Citation.]' [Citation.] When the contention on appeal is that the trial court failed to give a requested instruction, we review the record in the light most favorable to the party proposing the instruction to determine whether it was warranted by substantial evidence." (*Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 475 (*Alamo*).) We must reverse a judgment for instructional error in a civil case if, after examining the entire cause, we find it is reasonably probable the jury would have reached a result more favorable to the appellant in the absence of the error. (*Id.* at p. 476.)

13

unwarranted windfall . . . [and] something that is denied to other workers: the right to recover tort damages for industrial injuries caused by their employer's failure to provide a safe working environment." (*Id.* at pp. 699-700.) Allowing such recovery would also "produce[ ] the anomalous result that the nonnegligent person's liability [for an injury] is greater than that of the person whose negligence actually caused the injury," in that the contractor's exposure would be limited to workers' compensation while the hirer would be subject to tort damages. (*Id.* at p. 698.) Thus was born the *Privette* rule.

In the three decades since *Privette* was decided, our Supreme Court has repeatedly reaffirmed the general rule that a hirer is not liable for on-the-job injuries to an independent contractor's employee. (*Gonzalez, supra,* 12 Cal.5th at p. 41.) However, the rationale for the rule has evolved, and "more recent [Supreme Court] cases emphasize *delegation* as the key principle underlying this rule: Because the hirer presumptively delegates to the independent contractor the authority to determine the manner in which the work is to be performed, the contractor also assumes the responsibility to ensure that the worksite is safe, and the work is performed safely." (*Ibid.*, italics added; see *Sandoval v. Qualcomm Incorporated* (2021) 12 Cal.5th 256, 270 (*Sandoval*) [noting that in recent years, the primary rationale for the *Privette* doctrine has been "recast . . . in terms of delegation rather than workers' compensation"].)

Our Supreme Court has explained the delegation concept: "When an independent contractor is hired to perform inherently dangerous construction work, that contractor, unlike a mere employee, receives authority to determine how the work is to be performed and assumes a corresponding responsibility to see that the work is performed safely. The

14

independent contractor receives this authority over the manner in which the work is to be performed from the hirer by a process of delegation. This delegation may be direct, when the hirer has contracted with the independent contractor, or indirect, when the hirer contracts with another contractor who then subcontracts the work to the independent contractor." (*Tverberg v. Fillner Construction, Inc.* (2010) 49 Cal.4th 518, 528 (*Tverberg*).)

The presumption that a hirer delegates to a contractor all control over the contracted work, and with it all concomitant tort duties, "is grounded in two major principles: first, that independent contractors by definition ordinarily control the manner of their own work; and second, that hirers typically hire independent contractors precisely for their greater ability to perform the contracted work safely and successfully." (*Sandoval, supra,* 12 Cal.5th at p. 269.) The presumption is also supported by "[s]trong public policy considerations," including "society's need for clear rules about who's responsible for avoiding harms to workers when contractors are hired." (*Id.* at p. 264.)

The delegation of control over safety "may be direct, when the hirer has contracted with the independent contractor, or indirect, when the hirer contracts with another contractor who then subcontracts the work to the independent contractor." (*Tverberg, supra,* 49 Cal.4th at p. 528.) The *Privette* doctrine therefore bars liability against not only the hirer, but also any other entities in that "chain of delegation." (*Tverberg,* at p. 529; see, e.g., *Padilla v. Pomona College* (2008) 166 Cal.App.4th 661, 664–667, 671 [college

15

that hired general contractor, which in turn hired demolition contractor, was not liable for injuries to demolition contractor's employee].)[6]

"But the *Privette* doctrine has its limits. Sometimes a hirer intends to delegate its responsibilities to the contractor in principle but, by withholding critical safety information, fails to effectively delegate its responsibilities in practice; or a hirer delegates its responsibilities only partially by retaining control of certain activities directly related to the contracted work. When such situations arise, the *Privette* doctrine gives way to [two] exceptions." (*Sandoval, supra,* 12 Cal.5th at p. 271.)

The first exception arose out of *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198 (*Hooker*), in which our Supreme Court held that hirer owes a duty to a contract worker if the hirer retains control over any part of the work and negligently exercises that retained control so as to *affirmatively contribute* to the worker's injury. (*Id.* at p. 202.) The second exception was crafted in *Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659 (*Kinsman*), where the Supreme Court held that a landowner who hires an independent contractor may be liable if the landowner knew or should have known about a concealed hazard on the property that the contractor did

---

[6] Some cases suggest the *Privette* doctrine does not apply to non-hirers. (See, e.g., *Ramirez v. PK I Plaza 580 SC LP* (2022) 85 Cal.App.5th 252, 257, 265 [*Privette* not applicable to claims against shopping center asserted by injured contractor whom shopping center's tenant had hired to perform work because shopping center did not hire contractor and thus did not delegate responsibility for his safety]; *Gordon v. ARC Manufacturing, Inc.* (2019) 43 Cal.App.5th 705, 708, 718-719 [*Privette* not applicable to injured roofer's claims against building owner because owner did not hire roofer].) We respectfully disagree with those cases to the extent they hold that *Privette* only applies to hirers. In any event, those cases do not consider whether *Privette* applies to the parent company or owner of the hirer.

not know of and could not have reasonably discovered, and the landowner failed to warn the contractor of the hazard. (*Id.* at p. 664.)

It is undisputed here that *Privette* shields Sentinel, the plant owner: Sentinel hired and contracted with OPS, Collins's employer, to handle all safety matters at the plant, and in doing so, Sentinel both expressly (as a matter of contract) and presumptively (under *Privette*) delegated safety responsibilities to OPS. The issue before us is whether the same is true for DGC, as a partial indirect owner of Sentinel.

Our Supreme Court has recognized that *Privette* bars claims against any entity in the "chain of delegation." (See *Tverberg, supra,* 49 Cal.4th at pp. 528–529.) It is therefore possible that any safety-related responsibilities DGC may have had were delegated through Sentinel to OPS under *Privette*.

But our analysis does not end there. We must also determine whether either exception to *Privette* applies.[7]

We can quickly dispose of the *Kinsman* exception, since DGC is not a landowner who failed to warn OPS or its employees about a concealed hazard. *Kinsman* is therefore inapplicable.

The *Hooker* exception requires more analysis. In *Hooker*, our Supreme Court held that, notwithstanding *Privette's* presumption to the contrary, the hirer of an independent contractor may be held liable for injuries to the contractor's employees if the hirer exercised retained control over any part of the contractor's work in a manner that affirmatively contributed to the worker's injuries. (*Hooker, supra*, 27 Cal.4th at p. 202.)

---

[7] Plaintiffs fail to meaningfully address either exception in their brief; we consider them nonetheless.

17

The Supreme Court later explained that "[a] hirer 'retains control' where it retains a sufficient degree of authority over the manner of performance of the work entrusted to the contractor" (*Sandoval, supra,* 12 Cal.5th at p. 274); it "'actually exercise[s]' its retained control over the contracted work when it involves itself in the contracted work 'such that the contractor is not entirely free to do the work in the contractor's own manner'" (*id.* at p. 276); and it "[a]ffirmatively contribut[es]" to the injury if its "exercise of retained control contributes to the injury in a way that isn't merely derivative of the contractor's contribution to the injury" (*id.* at p. 277).

The Supreme Court made clear that liability may not be imposed on a hirer that retains some control over safety unless the hirer's exercise of that retained control affirmatively contributes to the injury. (*Hooker, supra,* 27 Cal.4th at pp. 202, 214-215 [finding no affirmative contribution where the onsite hirer had the authority and opportunity to stop the contractor from allowing traffic across the overpass, but did not induce the contractor to allow such traffic; the hirer merely "*permitted*" the traffic].) Instead, "*[s]omething more* is required, such as "'inducing injurious action or inaction through actual direction'" [citation]; directing "'the contracted work be done by use of a certain mode'" [citation]; or interfering with "'the means and methods by which the work is to be accomplished.'"'" (*Gonzalez, supra,* 12 Cal.5th at p. 42, citing *Hooker,* at pp. 211215, italics added.)

The jury in this case was not given an opportunity to decide whether DGC exercised retained control over OPS's work or whether its negligence affirmatively contributed to Collins's death, because the trial court refused to instruct on *Privette*. DGC urges us to resolve this factual issue in its favor in the first instance. We decline to do so. There are too many factual

18

questions here about the applicability of the *Hooker* exception for us to make such a determination.

On the one hand, there is substantial evidence that DGC undertook to ensure Walker was adequately performing his safety-related functions as OPS plant manager, at least from the plant's construction through mid-2016: DGC executives interviewed and hired Walker to serve as OPS plant manager in 2012; DGC gave OPS sample safety policies in 2013 so that OPS could prepare its own safety policies for the Sentinel plant; DGC executives supervised Walker and conducted his annual reviews through August 2016; and yet DGC apparently never counseled Walker about his failure to train OPS employees or conduct the requisite audits. The evidence also suggests that even after August 2016, when Walker stopped reporting to DGC and began reporting to another OPS employee, DGC was still involved in plant safety, as it hosted quarterly meetings with Walker and other OPS managers and reviewed OPS's proposed changes to the plant's safety and procedure manuals in fall 2016.

On the other hand, there is evidence that DGC was not involved in the particular safety failures that led to the March 2017 explosion: it was OPS employees (not DGC employees) who proposed and approved the January 2017 changes to the LOTO sheet; and it was OPS plant manager Tom Walker, then supervised by OPS general manager Adam Christodoulou, who neglected to train OPS employees on those changes after they were adopted in January 2017. Additionally, Plaintiffs' own expert admitted there was no evidence that DGC played any role in supervising shutdowns, in ensuring the LOTO sheet procedures were followed, in ensuring OPS employees were trained, or in ensuring OPS complied with applicable safety regulations.

19

Given these conflicting facts, we cannot resolve whether DGC retained control over OPS's work or whether it was negligent in a manner that affirmatively contributed to Collins's death. A determination of the applicability of the *Hooker* exception to the *Privette* doctrine must be left to the trier of fact.

Viewing the record in the light most favorable to DGC (the party that proposed the *Privette*-related instructions), we conclude such instructions were warranted by substantial evidence, and the trial court therefore erred in failing to provide them. We further conclude the trier of fact could reasonably have reached a result more favorable to DGC in the absence of the error. Accordingly, we must reverse the judgment and order a new trial. (*Alamo, supra,* 219 Cal.App.4th at pp. 475-476.)[8]

## DISPOSITION

The judgment and postjudgment orders are reversed. The matter is remanded to the trial court for a new trial. The trial court is directed to

---

[8] In light of our holding, we need not reach DGC's additional arguments on negligent undertaking, the allocation of fault, or excessive damages. We also deny as moot Plaintiffs' request for judicial notice of various documents reflecting that the jury verdict was not excessive.

20

instruct the jury on the *Privette* doctrine and the *Hooker* exception. DGC shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a).)


GOETHALS, J.

WE CONCUR:


MOORE, ACTING P. J.


MOTOIKE, J

21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| DENISE COLLINS et al.,<br><br>   Plaintiffs and Respondents,<br><br>     v.<br><br>DIAMOND GENERATING<br>CORPORATION,<br><br>   Defendant and Appellant. | G062752<br><br>(Super. Ct. No. PSC1901096)<br><br>ORDER GRANTING REQUEST<br>FOR PUBLICATION AND<br>DENYING PETITION FOR<br>REHEARING |

        Appellant has requested that our opinion filed on December 11, 2024, be certified for publication. It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c). The request is GRANTED.

        The opinion is ordered published in the Official Reports.

Appellant's petition for rehearing filed on December 26, 2024, is DENIED.


GOETHALS, J.

WE CONCUR:


MOORE, ACTING P. J.


MOTOIKE, J.