[Civ. No. 66923. Second Dist., Div. Four. Apr. 19, 1983.]

BRIAN MITTENHUBER, a Minor, etc., Plaintiff and Appellant, v.
CITY OF REDONDO BEACH et al., Defendants and Respondents.

COUNSEL

Spector, Buter & Cone, Michael A. Hoberman and Allan E. Cone for Plaintiff and Appellant.

George H. Ellis and John M. Raders for Defendants and Respondents.

OPINION

WILLETT, J.*—The plaintiff appeals from a judgment entered in favor of defendant City of Redondo Beach following the sustaining, without leave to amend, of defendant's demurrer to plaintiff's third amended complaint for damages.

On March 1, 1979, plaintiff, a six-year-old boy, was involved in a bicycle-automobile accident which occurred at the intersection of Voorhees Avenue and Phelan Avenue, both public streets within the City of Redondo Beach. On privately owned property situated on the northeast corner of the intersection, a wall and fence had been constructed which impaired the visibility of traffic approaching the intersection. Phelan Avenue runs north-south and is not controlled by any signal or stop sign as it crosses Voorhees Avenue. Voorhees Avenue runs east-west and is controlled by stop signs for traffic eastbound and westbound. Plaintiff was operating a bicycle westbound on Voorhees Avenue approaching Phelan Avenue. At about the same time, defendant Ramon Herrera was operating a Volkswagen vehicle southbound on Phelan approaching Voorhees Avenue. The bicycle and Volkswagen collided within the intersection and plaintiff sustained injuries.

Plaintiff claims defendant City of Redondo Beach (City) is liable for the injuries based upon the existence of a "dangerous condition" at the intersection. Plaintiff sets forth 10 factors and circumstances to support his contention that the intersection was in a dangerous condition. The ten factors set forth in plaintiff's third amended complaint are as follows:

---

*Assigned by the Chairperson of the Judicial Council.

"(1) Persons driving motor vehicles southbound on Phelan approaching its intersection with Voorhees could not see children on bicycles approaching the intersection from the east on Voorhees Avenue;

"(2) Bicyclists westbound on Voorhees approaching the intersection could not see motor vehicles approaching the intersection from the north on Phelan;

"(3) Phelan was heavily used as a through thoroughfare;

"(4) Vehicles on Phelan approaching the intersection from the north travel downhill, often resulting in excessive speed;

"(5) Numerous children normally rode bicycles in the neighborhood and westbound on Voorhees Avenue through said intersection;

"(6) Children on bicycles approaching the intersection from the east travel downhill, often resulting in excessive speed and making it extremely difficult for them to stop quickly;

"(7) Defendants, and each of them, installed stop signs on Voorhees Avenue in such a manner as to invite reliance on them by motorists traveling on Phelan; . . .

"(8) The wall and fence at 2501 Voorhees Avenue more particularly described hereinabove prevented motorists southbound on Phelan, approaching said intersection, from seeing bicyclists approaching said intersection westbound on Voorhees Avenue until after such motorists were committed to said intersection;

"(9) The wall and fence at 2501 Voorhees Avenue, more particularly described hereinabove, prevented bicyclists westbound on Voorhees Avenue, approaching said intersection, from seeing motorists approaching said intersection southbound on Phelan until after such bicyclists were committed to said intersection;

"(10) The intersection had inadequate markings, traffic controls or warnings."

The City contends that the complaint fails to establish, as a matter of law, the existence of a "dangerous condition" at the intersection. We agree.

■ A public entity may be liable for injury caused by a dangerous condition on its property. To state a cause of action under the California Tort Claims Act of 1963 (Gov. Code, §§ 830-840.6), based on a dangerous condition of public

property, the complaint must satisfy Government Code section 835. That section provides: "Except as provided by statute, a public entity is liable for injury caused by a dangerous condition of its property if the plaintiff establishes that the property was in a dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:

"(a) A negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or

"(b) The public entity had actual or constructive notice of the dangerous condition under Section 835.2 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition."

Because recovery is based on a statutory cause of action, the plaintiff must set forth facts in his complaint sufficiently detailed and specific to support an inference that each of the statutory elements of liability is satisfied. General allegations are regarded as inadequate. (*Susman* v. *City of Los Angeles* (1969) 269 Cal.App.2d 803, 809 [75 Cal.Rptr. 240]; *Vedder* v. *County of Imperial* (1974) 36 Cal.App.3d 654, 659 [111 Cal.Rptr. 728]; *County of Ventura* v. *City of Camarillo* (1978) 80 Cal.App.3d 1019, 1025 [144 Cal.Rptr. 296]; Van Alstyne, Cal. Government Tort Liability (Cont.Ed.Bar 1980) § 3.72.)

A "dangerous condition" as defined by Government Code section 830 "means a condition of property that creates a substantial (as distinguished from a minor, trivial or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." ■ The existence of a dangerous condition is usually a question of fact and may be resolved as a question of law only if reasonable minds can come to but one conclusion. (Gov. Code, § 830.2; *De La Rosa* v. *City of San Bernardino* (1971) 16 Cal.App.3d 739, 745 [94 Cal.Rptr. 175]; *Gray* v. *Brinkerhoff* (1953) 41 Cal.App.2d 180, 183 [258 P.2d 834]; *Bakity* v. *County of Riverside* (1970) 12 Cal.App.3d 24, 30 [90 Cal.Rptr. 541].)

■ In order to determine whether plaintiff set forth facts sufficiently detailed and specific to support a dangerous condition allegation, it is necessary to examine the ten factors and circumstances on which plaintiff relies.

*Factors one* and *two* state that "persons driving motor vehicles southbound on Phelan approaching its intersection with Voorhees could not see children on bicycles approaching the intersection from the east on Voorhees Avenue" and that "[b]icyclists westbound on Voorhees approaching intersection could not see motor vehicles approaching the intersection from the north on Phelan."

These factors may be summarized as concluding that the subject intersection was a blind intersection. A city is under no affirmative duty to erect stop signs at such an intersection. Government Code section 830.4 provides: "A condition is not a dangerous condition within the meaning of this chapter merely because of the failure to provide regulatory traffic control signals, stop signs, yield right-of-way signs, or speed restriction signs, as described by the Vehicle Code, or distinctive roadway markings as described in Section 21460 of the Vehicle Code." Additionally, Government Code section 830.8 provides in pertinent part as follows: "Neither a public entity nor a public employee is liable under this chapter for an injury caused by the failure to provide traffic or warning signals, signs, markings or devices described in the Vehicle Code."

Government Code section 830.4 was a codification of *Perry* v. *City of Santa Monica* (1955) 130 Cal.App.2d 370 [279 P.2d 92]. In *Perry*, the complaint described the intersection as follows: "At the time of the accident the intersection of Euclid and Michigan Avenue was in a dangerous and defective condition. It was so laid out, constructed, and maintained that a 'vehicle' traveling northerly on Euclid could not see traffic approaching from the west on Michigan without first entering the intersection and placing 'itself' in a hazardous position and a 'vehicle' traveling westerly on Michigan could not see traffic approaching in a northerly direction on Euclid without first entering the intersection. It was a heavily traveled blind intersection and it did not have traffic signals, stop signs, semaphores, or other traffic control devices. . . ." (*Id.* at p. 371.)

In upholding the sustaining of the demurrer by the trial court, the Court of Appeal stated as follows: "It has been repeatedly held that a city is not an insurer of the safety of travelers; it is required only to exercise ordinary care to maintain its streets in a reasonably safe condition for those using them." (*Id.* at p. 372.)

"Plaintiffs, whose burden it is to show an actionable wrong, have cited no authority whatever where, under facts and circumstances at all comparable or similar to those alleged in their complaint, a municipality or any other local agency has been held liable. To hold that the city had the affirmative duty to erect stop signs at the intersection in question would unduly extend the scope of the Public Liability Law and go far toward establishing the rule that a municipality is an insurer. The trial court properly sustained the demurrer." (*Perry* v. *City of Santa Monica, supra,* 130 Cal.App.2d at p. 375.)

Plaintiff's allegations regarding the inability of persons operating motor vehicles and bicycles to see each other while approaching the intersection, are not supportive of the conclusion that the intersection was in a dangerous condition. This is particularly true in that the plaintiff also alleges that the City had installed stop signs on Voorhees prior to the accident. A blind intersection may

be dangerous; however, the dangerous nature of such an intersection may be obviated by the placement of a stop sign on one of the streets requiring travelers to stop and not enter the intersection until it is safe.

The *third* and *fifth factors* set forth in plaintiff's third amended complaint alleged that "Phelan was heavily used as a through thoroughfare" and that "[n]umerous children normally rode bicycles in the neighborhood and westbound on Voorhees Avenue through said intersection." These factors add nothing to plaintiff's attempts to allege a dangerous condition. Many of the streets and highways of this state are heavily used by motorists and bicyclists alike. However, the heavy use of any given paved road alone does not invoke the application of Government Code section 835.

In *factors four* and *six* of the third amended complaint the plaintiff alleges that the topography of the land is such that "[v]ehicles on Phelan approaching the intersection from the north travel downhill, often resulting in excessive speed" and that "[c]hildren on bicycles approaching the intersection from the east travel downhill, often resulting in excessive speed and making it extremely difficult for them to stop quickly."

These are not allegations that the physical properties of the road make the intersection inherently dangerous. The mere fact that a road slopes downhill does not mean that it is dangerous. To hold the defendant liable for the natural topography of the land would be to impose strict liability on the defendant as an insurer of the safety of its streets. The City would be required to either grade all of its streets level in hilly areas or to forego development in such areas. An ordinary, natural topographical condition is not a dangerous condition of property within the meaning of the governmental tort liability law. It is such, and requires a warning sign, only when it constitutes a deceptive condition or trap for even those who use the property with due care. (*Bunker* v. *City of Glendale* (1980) 111 Cal.App.3d 325, 328 [168 Cal.Rptr. 565]; Gov. Code, § 830.8.) Highways are normally adapted to the natural geographic feature of the lay of the land.

The present case is distinguishable from *Bunker* v. *City of Glendale, supra,* 111 Cal.App.3d 325. In *Bunker,* the Court of Appeal found a basis for imposition of liability against the defendant City under Government Code section 830.8, holding that the City had not adequately provided for signs warning of a condition which the City *conceded* to be dangerous. In the present case, plaintiff makes no attempt to specifically allege how or in what manner he was inadequately warned of a dangerous condition.

In an attempt to circumvent the fact that a stop sign existed for plaintiff's direction of travel, a unique theory was pleaded. In *factor seven* the plaintiff

states that the defendant installed stop signs on Voorhees Avenue in such a manner as to invite reliance on them by motorists traveling on Phelan. This unique "invited reliance" theory is used to establish that the intersection was in a dangerous condition. The theory is set forth in the complaint as follows:

"Motorists traveling southbound on Phelan approaching its intersection with Voorhees Avenue relied on the stop signs on Voorhees as follows:

"Such motorists assumed that because of the stop signs on Voorhees that all cross-traffic would stop at the intersection; as a result, motorists southbound on Phelan often drove with excessive speed and proceeded to and through said intersection without adequately slowing.

"As a result of that reliance, together with all [the ten factors and circumstances], the installation of the stop signs on Voorhees Avenue was negligent and caused and contributed to the dangerous condition alleged herein."

It would appear from this theory that motorists traveling on Phelan Avenue could readily observe the stop sign, thus assuming that eastbound and westbound vehicular traffic on Voorhees Avenue would stop.

This "invited reliance" theory was first discussed by Justice Traynor in *Teall* v. *City of Cudahy* (1963) 60 Cal.2d 431, 434 [34 Cal.Rptr. 869, 386 P.2d 493]. In *Teall,* a seven-year-old child was struck by a truck while crossing a street. The complaint alleged that due to the arrangement of the traffic signals at the intersection, the only signal visible to the child indicated to her that vehicular traffic in the street she wished to cross would yield the right of way; whereas all signals were in fact red during each cycle to permit vehicles that had entered the intersection on a green light to clear it before pedestrians began to cross. Relying on this only visible light, the child entered the crosswalk and was hit by a truck which had entered the intersection on a green light, but had not yet cleared the intersection. Justice Traynor stated, "Pedestrians have a right to rely on traffic signals. The only signal visible to plaintiff indicated to her that north and south vehicular traffic would yield the right of way. Such a condition involves an unreasonable risk of injury to the public. It is not materially different from one in which, because of a mechanical defect, all lights at an intersection are green simultaneously. (See *Bady* v. *Detwiler* (1954) 127 Cal.App.2d 321 [273 P.2d 941].) The allegations of the complaint are therefore sufficient to state a cause of action.

"Defendant contends that only an additional signal would have remedied the condition complained of and that under *Perry* v. *City of Santa Monica,* 130 Cal.App.2d 370, 372-375 . . . it had no duty to install one. (See also Gov.

Code, §§ 830.4, 830.8.) In the present case, however, defendant undertook to control traffic at the intersection and *invited reliance* on the signals. It may be held liable if it created a dangerous or defective condition in doing so. [Citations.]" (*Teall* v. *City of Cudahy, supra,* 60 Cal.2d 431, 434, italics added.) This invited reliance doctrine, for reasons hereinafter discussed, does not apply in this case.

The driver of any vehicle approaching a stop sign at the entrance to an intersection shall stop at a limit line, if marked, or the near side of a crosswalk. If there is no limit line or crosswalk, the driver shall stop at the entrance to the intersecting roadway crossing. (Veh. Code, § 22450.)

The driver of a vehicle on an established through highway or boulevard approaching an intersection which is appropriately marked with stop signs is not required to reduce his speed at those intersections so long as he is traveling at a safe speed for the condition. (*Gritsch* v. *Pickwick Stages System* (1933) 131 Cal.App. 774 [22 P.2d 554]; Veh. Code, § 22350.)

The rule that the first automobile to enter an intersection has the right of way does not apply to an intersection where one of the two highways is a throughway protected from traffic by a stop sign. "In such a situation the driver on the throughway has a right to assume that the driver on the intersecting highway will obey the stop sign and yield him the right of way." (*Ambra* v. *Woolsey* (1942) 55 Cal.App.2d 104, 106 [130 P.2d 152].)

A motorist on a through highway has the right to assume that another motorist approaching an intersection from a sideroad possesses normal faculties, and that he saw any stop sign which was directly within the range of his vision. (*Rodabaugh* v. *Tekus* (1952) 39 Cal.2d 290, 294 [246 P.2d 663].)

Therefore, a motorist traveling southbound on Phelan Avenue, a through highway, could justifiably rely that westbound traffic on Voorhees would stop at the intersection and was under no obligation to slow his speed before entering the intersection. Approval of plaintiff's "invited reliance" theory would require all through traffic to slow to a standstill at every intersection in the state. Every city wishing to avoid liability would have to remove all existing stop signs and forego erecting new stop signs and signals at any intersection.

The present case is clearly distinguishable from *Teall.* In *Teall,* the placement of the traffic signals to control pedestrians and moving vehicles at the offset intersection was defective in design. A pedestrian, relying on the only visible signal, was justified in his belief that vehicular traffic would yield the right of way, not knowing that through traffic may still be within the intersection. It was the same as if all lights at the intersection were green simultaneously. In the in-

stant case, there were no specific factual allegations stated by the plaintiff that the placement of any stop sign was done in a defective or confusing manner.

Nowhere in plaintiff's third amended complaint is it stated that plaintiff was unable to observe the stop sign on Voorhees or that the defendant was negligent in maintaining the sign. Plaintiff relied heavily on two cases, *Bakity* v. *County of Riverside, supra,* 12 Cal.App.3d 24 and *De La Rosa* v. *City of San Bernardino, supra,* 16 Cal.App.3d 739. In both of these cases there was evidence to show that the stop sign was obstructed.

In *Bakity* the stop sign controlling westbound traffic on the east-west street was located 36 feet east of the eastern line of the intersection without any signs, either posted or painted, warning motorists of the impending stop. The stop sign was located near a eucalyptus tree and there were several tangerine trees near the southeast corner of the intersection which obstructed the vision of each driver of the approach of the other vehicle for a distance of about 100 feet from the intersection. The speed limit on the controlled east-west street was 65 miles per hour. There was testimony that during the day the shade from the trees made the stop sign difficult to see. There was also testimony that at night, the stop sign would be illuminated at a distance of approximately 350 feet, but a vehicle traveling 65 miles per hour could not stop within a distance of 350 feet.

The court ruled in *Bakity* that placing a stop sign in an unanticipated position, 36 feet from the intersection, could constitute a trap for an unwary motorist. Quoting *Bakity*: "Placing a stop sign in an unanticipated position could constitute a trap for an unwary motorist. Although sections 830.4 and 830.8 of the Government Code . . . provide that a public entity may not be held liable for failure to install traffic signs and signals, when it does so in such a manner as to constitute a trap, liability may be imposed for the maintenance of a dangerous condition." (*Bakity* v. *County of Riverside, supra,* 12 Cal.App.3d 24, 31.)

There is no allegation in the plaintiff's complaint that the stop signs on Voorhees Avenue were placed in an "unanticipated position" so as to constitute "a trap for the unwary motorist." (*Bakity, supra,* 12 Cal.App.3d at p. 31.)

In *De La Rosa* v. *City of San Bernardino, supra,* 16 Cal.App.3d 739, there was evidence that a walnut tree and shrubbery on the west side of the street on which plaintiffs were traveling south, impaired the visibility of the stop sign to such an extent that it was barely visible during the day and could not be seen by southbound motorists at night. There was also evidence of numerous accidents at the intersection involving vehicles traveling south, as well as evidence that a "stop ahead" legend on the pavement was faded. The court concluded that there was considerable evidence on which the jury could reasonably have found

the existence of a dangerous condition, thereby reversing the judgment of the trial court for a directed verdict in favor of the defendant City.

In the present case, there is no allegation that the stop sign for westbound traffic on Voorhees was placed improperly or that it was obstructed in any manner.

The *eighth* and *ninth factors* on which plaintiff relied to show a dangerous condition both involve a wall and fence. It was alleged that a wall and fence on private property at the corner of Voorhees and Phelan prevented motorists southbound on Phelan and bicyclists westbound on Voorhees, approaching the intersection, from seeing each other until after they were committed to the intersection.

Plaintiff cites the case of *Feingold* v. *County of Los Angeles* (1967) 254 Cal.App.2d 622 [62 Cal.Rptr. 396] as having facts strikingly similar to the present case. In the *Feingold* case, the plaintiff appealed from a judgment of dismissal following the sustaining of a demurrer without leave to amend. In *Feingold,* it was alleged that drivers entering the subject intersection were unable to observe each other because of the topography of the land, until either or both had committed themselves to entering the intersection, *regardless* of whether the posted stop signs were heeded. The court concluded that the plaintiff had pleaded an actionable dangerous condition of public property by alleging that: "[T]he driver of a vehicle entering the intersection from the north on Malibu Canyon Road . . . and the driver of a vehicle entering said intersection from the east on Mulholland Highway . . . are unable to observe each other because of the promontory of land on property adjacent to the northeast corner of the intersection until either or both drivers are committed to the intersection, *regardless* of the degree of caution exercised by the driver of the vehicle from the east on Mulholland Highway. Consequently, a westbound Mulholland vehicle, *regardless* of whether the driver heeds the boulevard stop sign, is in danger upon entering the intersection from southbound vehicles on Malibu Canyon Road because of the topography of the intersection. The alleged inability of one of the drivers to see the other for some period of time or space after such driver is committed to the intersection created a dangerous condition of public property which proximately contributed to the injury of plaintiffs and which created a reasonably foreseeable risk of such injury." (*Feingold* v. *County of Los Angeles, supra,* at pp. 625-626, italics added.)

The *Feingold* complaint specifically alleged facts supporting the allegation that motorists entering the intersection could not see each other after they were committed to the intersection. The primary fact supporting this conclusion was that the topography was such that even if the motorist obeyed the posted stop sign at the intersection, the motorist nevertheless was placed in danger once he

entered the intersection. The complaint in *Feingold* specifically alleged that it made no difference whether or not the posted stop sign was obeyed; motorists were placed in jeopardy in either event. The present complaint, on the other hand, alleges no specific facts which would support the conclusion that motorists could not see each other until after they were committed to the intersection. The complaint does not, for example, allege that bicyclists obeying a stop sign posted on Voorhees could not see motorists traveling southbound on Phelan from the vantage point of the stop sign limit line.

The *10th* and *final factor* on which plaintiff relies to support a finding of a dangerous condition is that "the intersection had inadequate markings, traffic controls or warnings." This is a mere conclusion and does not come into play until existence of the dangerous condition, within the statutory definition, is first shown. (Gov. Code, § 830.8; *Feingold* v. *County of Los Angeles, supra,* 254 Cal.App.2d 622, 626; *Pfeifer* v. *County of San Joaquin* (1967) 67 Cal.2d 177, 184 [60 Cal.Rptr. 493, 430 P.2d 51].)

Kingsley, Acting P. J., and Amerian, J., concurred.