Filed 12/14/21  Rupasinghe v. City of Los Angeles CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| VIDURA PAUL RUPASINGHE, et al., | B291364 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC603062) |
| v. | |
| CITY OF LOS ANGELES, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Marc D. Gross, Judge.  Affirmed.

McNicholas & McNicholas, Matthew S. McNicholas, Jeffrey R. Lamb and Emily R. Pincin for Plaintiffs and Appellants.

Michael N. Feuer, City Attorney, Kathleen A. Kenealy, Chief Deputy City Attorney, Scott Marcus, Senior Assistant City Attorney, Blithe S. Bock, Managing Assistant City Attorney and Shaun Dabby Jacobs, Deputy City Attorney for Defendant and Respondent.

_____

Harvey Kaplan fatally struck Rita Rupasinghe with his car as she crossed Overland Avenue at Rose Avenue in a marked crosswalk.  Rupasinghe's adult sons, Saranga Upsanna Rupasinghe and Vidura Paul Rupasinghe (plaintiffs), sued the City of Los Angeles, alleging their mother's death was caused by a dangerous condition at the intersection.  (Gov. Code, § 835.)[1] The trial court granted City's motion for summary judgment, finding as a matter of law the intersection was not a dangerous condition at the time of Rupasinghe's death. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

1. **Undisputed Facts**

On November 10, 2014, at approximately 6:40 p.m., Kaplan was driving southbound on Overland Avenue toward Rose Avenue in the number two lane closest to the curb.  He testified in his deposition he was travelling at approximately 15 to 20 miles per hour.  Rupasinghe was crossing from east to west on Overland in a marked crosswalk at Rose.  Kaplan hit her with his car as she neared the west end of the crosswalk.  She died before emergency personnel arrived.

The weather was clear, and it was dark outside.  The roadway surface was dry.  There were no unusual roadway conditions such as holes, deep ruts, loose material, obstructions, construction, repair zones, roadway width reduction, or flooding.

Where it intersects with Rose, Overland runs north and south with two lanes of traffic in each direction separated by a center turn lane that is ten feet wide.  The intersection at Overland and Rose is a "jogged" intersection, meaning Rose does not run straight through Overland.  Instead, two offset

---

[1]      All further undesignated statutory references are to the Government Code.

intersections are created: the north jog of Rose intersects the east side of Overland at a T-intersection and the south jog of Rose intersects the west side of Overland at a second T-intersection. Rupasinghe was crossing Overland at the north jog of Rose in a crosswalk that is 15 feet wide with multiple two-foot-wide yellow ladder bars between one-foot-wide yellow boundary stripes spanning the entire width of Overland.

As Overland approaches Rose from the north, it has a straight alignment and runs downhill with a grade ranging from 10 percent to 3.2 percent at the crosswalk. A school is located near the intersection. The posted speed limit in that portion of Overland is 25 miles per hour when children are present or 35 miles per hour otherwise. Signs and pavement markings on the southbound side of Overland include: an eight-foot tall "SLOW SCHOOL XING" roadway marking, two different Advance School Crossing Ahead signs, a Yield Here to Pedestrian sign, white shark's teeth Yield Markings in the roadway, and two fluorescent yellow-green School Crosswalk signs with a 45-degree down arrow on either end of the marked crosswalk.

An overhead streetlight is located on the west sidewalk of Overland, adjacent to the west end of the crosswalk. An overhead streetlight is also located on the northeast corner of Overland and Rose. There are three streetlights on each side of Overland as it approaches the north jog of Rose. All were operational that evening. There is a signalized intersection on Overland at the south jog of Rose.

2.    *The Lawsuit*

On December 7, 2015, plaintiffs filed a complaint against City, alleging Rupasinghe's death was caused by a dangerous condition of public property under section 835. City moved for

3

summary judgment, arguing the Overland and Rose intersection was not a dangerous condition as a matter of law, it lacked notice of any dangerous condition, and it was entitled to design immunity. Plaintiffs' opposition primarily relied on a declaration from their traffic and civil engineering expert, Edward Ruzak, who opined on the existence of a dangerous condition at the intersection. The expert identified a number of factors that combined to create a dangerous condition, including the downhill grade, shortened stopping sight distance, curb parking blocking the view, foliage blocking the view or creating shadows, inadequate lighting conditions, oncoming vehicular traffic, inadequate gaps in traffic, lack of warnings or signs, and lack of traffic signals. The expert also cited to prior accidents at that intersection to conclude it was a dangerous condition and that City had notice of the danger prior to Rupasinghe's death. City objected extensively to the expert's declaration. The trial court sustained some of City's objections and declined to rule on others as they did not affect its analysis.

The trial court granted summary judgment in favor of City. It examined each factor identified by plaintiffs as contributing to the dangerous condition and concluded as a matter of law that none of the factors, whether considered alone or together, rendered the intersection dangerous. Having reached this conclusion, the court declined to rule on City's lack of notice and design immunity arguments.

Plaintiffs timely appealed.

### DISCUSSION

Plaintiffs seek reversal of the order granting City's motion for summary judgment and the associated evidentiary rulings that excluded portions of their expert's declaration and the

4

driver's deposition testimony.[2]  Plaintiffs do not contend City failed to meet its initial burden to negate the existence of a necessary element of the cause of action.  As a result, we focus on whether plaintiffs meet their burden to demonstrate a triable issue of material fact exists as to the dangerous condition element of their claim.  Given this focus, we need not address those issues or evidentiary rulings that do not affect our consideration of the dangerous condition element.

1.     *Standard of Review*

    " 'A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail.' [Citation.]  The pleadings define the issues to be considered on a motion for summary judgment.  [Citation.]  As to each claim as framed by the complaint, the defendant must present facts to negate an essential element or to establish a defense.  Only then will the burden shift to the plaintiff to demonstrate the existence of a triable, material issue of fact.  [Citation.]" (*Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 252.)  "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the

---

[2]     Plaintiffs complain that the exclusion of their evidence resulted in a lack of triable issues of material facts.  Our review of the legal authorities shows that even if plaintiffs' evidence – primarily comprised of the driver's deposition testimony and their expert's declaration – was admitted, their claim that a dangerous condition existed fails as a matter of law.  Our analysis does not require we review each of the trial court's evidentiary rulings.

applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.)

"We review an order granting summary judgment de novo. [Citation.] The trial court's stated reasons for granting summary judgment are not binding because we review its ruling not its rationale." (*Canales v. Wells Fargo Bank, N.A.* (2018) 23 Cal.App.5th 1262, 1268–1269.)

"We apply the abuse of discretion standard when reviewing the trial court's rulings on evidentiary objections." (*Twenty-Nine Palms Enterprises Corp. v. Bardos* (2012) 210 Cal.App.4th 1435, 1447.) An "erroneous evidentiary ruling requires reversal only if 'there is a reasonable probability that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*Id.* at p. 1449.)

Plaintiffs urge us to independently review the trial court's evidentiary rulings, citing *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535, in which the Supreme Court expressly left unresolved whether evidentiary rulings on a motion for summary judgment are reviewed for abuse of discretion or de novo. The appellate courts are split on this issue. (See e.g., *Schmidt v. Citibank, N.A.* (2018) 28 Cal.App.5th 1109, 1118 [applying abuse of discretion standard]; *Pipitone v. Williams* (2016) 244 Cal.App.4th 1437, 1451 [applying de novo review].) However, "the weight of authority" favors applying an abuse of discretion standard to evidentiary rulings on summary judgment motions and we follow those cases. (*Schmidt,* at p. 1118; see generally Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2021) ¶ 8.168, p. 8-148 ["Pursuant to the weight of authority, appellate courts review a trial court's rulings on evidentiary

objections in summary judgment proceedings for *abuse of discretion.*"].)

## 2. *Overview of Law on Entity Liability for Dangerous Conditions*

A public entity is not liable for an injury arising out of the alleged act or omission of the entity except as provided by statute. (§ 815.) Under section 835, a public entity may be liable if the following four elements are proven: "(1) a dangerous condition existed on the public property at the time of the injury; (2) the condition proximately caused the injury; (3) the condition created a reasonably foreseeable risk of the kind of injury sustained; and (4) the public entity had actual or constructive notice of the dangerous condition of the property in sufficient time to have taken measures to protect against it." (*Brenner v. City of El Cajon* (2003) 113 Cal.App.4th 434, 439 (*Brenner*).)

When it comes to public roadways, "a public entity is only required to provide roads that are safe for reasonably foreseeable careful use." (*Chowdhury v. City of Los Angeles* (1995) 38 Cal.App.4th 1187, 1196.) "[P]ublic liability lies under section 835 only when a feature of the public property has 'increased or intensified' the danger to users from third party conduct." (*Bonanno v. Central Contra Costa Transit Authority* (2003) 30 Cal.4th 139, 155 (*Bonanno*).)

Because City is entitled to summary judgment if any one of the section 835 elements cannot be established, and the parties' primary dispute involves whether there was a dangerous condition at the location of the accident (the first of the four elements), we address only that element and do not address the remaining section 835 components listed by *Brenner*.

7

### 3. *Plaintiffs Identify Four Factors as Contributing to a Dangerous Condition*

Plaintiffs contend the following factors, in combination, created a dangerous condition: "[1] an initial grade slope of 8-10%, which allows cars to easily travel above the maximum speed limit; [2] overhanging streetlights obscured by trees and various foliage, which causes shadows to fall over the roadway; [3] the oncoming glare of headlights from oncoming northbound traffic, which causes motorists to have to focus directly on the road in front of them as opposed to 800 feet forward; and [4] lack of lighted warning signs, signals, or flashers indicating the presence of pedestrians."[3]

We examine here whether there exists a triable issue of fact such that any factor identified by plaintiffs, standing alone or in combination, created a dangerous condition for which City may be liable.

### 4. *None of the Factors Identified by Plaintiffs Contributed to a Dangerous Condition*

#### i. *Downhill Slope*

Plaintiffs assert the initial downward slope on Overland of 8 to 10 percent grade results in cars speeding down the hill, citing to their expert's statement to that effect.

In his declaration, plaintiffs' expert stated, "The subject crosswalk at the bottom of a hill in a heavily travelled roadway

---

[3] On appeal, plaintiffs appear to have abandoned some of the factors they argued to the trial court were contributors to the dangerous condition, including shortened stopping sight distance, curb parking, and inadequate gaps in traffic. We do not address them.

8

causes confusion and surprise to drivers. . . . It is foreseeable at this location that drivers will be traveling at downhill speeds which can easily [operate and] approach 45 mph." City objected to this portion of the expert's declaration on the ground it was irrelevant, it lacked foundation, there was no basis for such an opinion, it was speculative, and it was outside of the scope of the expert's permitted testimony. The trial court sustained the objection, specifically finding "Ruzak's declaration that drivers can easily reach speeds of up to 45 mph on the downhill grade is not relevant to this particular case, where the driver was driving at less than half that speed."

We agree this portion of the expert's declaration is irrelevant. Here, the only evidence of the driver's speed was his deposition testimony that he was driving approximately 15 to 20 miles per hour. City's objection to the expert's statement about cars speeding down Overland was properly sustained. (*Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 126–27 [" 'an expert's opinion that something could be true if certain assumed facts are true, without any foundation for concluding those assumed facts exist' [citation], has no evidentiary value"].)

If we excise the portion of the expert's statement regarding speeding, the remaining factor — it is undisputed the road sloped downhill — cannot form the basis for a dangerous condition. "The mere fact that a road slopes downhill does not mean that it is dangerous. To hold the defendant liable for the natural topography of the land would be to impose strict liability on the defendant as an insurer of the safety of its streets. The City would be required to either grade all of its streets level in hilly areas or to forego development in such areas. An ordinary, natural topographical condition is not a dangerous condition of

9

property within the meaning of the governmental tort liability law." (*Mittenhuber v. City of Redondo Beach* (1983) 142 Cal.App.3d 1, 7 (*Mittenhuber*).)

Even if we were to conclude the trial court abused its discretion in excluding the testimony on speeding, the *Mittenhuber* court rejected this precise argument. There, the plaintiff alleged, "[v]ehicles on Phelan approaching the intersection from the north travel downhill, often resulting in excessive speed" and "[c]hildren on bicycles approaching the intersection from the east travel downhill, often resulting in excessive speed and making it extremely difficult for them to stop quickly." The court concluded these factors, even if true, did not make the intersection inherently dangerous. (*Mittenhuber, supra*, 142 Cal.App.3d at p. 7.) We agree.

### ii. Trees and Foliage

Plaintiffs next claim trees and foliage along the street contributed to a dangerous condition because they obscured overhanging streetlights and caused shadows to fall over the roadway once it was dark. According to plaintiffs' expert, these shadows confused drivers. The driver also testified regarding the trees along Overland.

The driver testified, "the crosswalk itself is -- it doesn't lend itself -- to a clear appearance, . . . where you . . . can really delineate everything. . . there's so many things going on, the trees and the other things and the steepness and the rest of it, that it's, you know, for me, I was always, you know, cautionary just when I went there to slow down." When asked to clarify what he meant by "trees," he responded, "To the right is where -- which I thought where she came from -- were trees. And then there's some houses, some apartments, and some other -- and then on the left,

10

there's a store and some other thing -- something like that. And so the combination of those things make, you know, make -- I always slow down because -- it was one of those things." City objected to the driver's testimony on the ground his testimony about a "clear appearance" and "so many things going on" was vague and ambiguous. The trial court sustained these objections.

Relying in part upon the driver's testimony, plaintiffs' expert attributed the driver's failure to see Rupasinghe to a combination of factors, including "shadows on the roadway, overhanging foliage, darkness, inconsistent and/or difficult lighting conditions." The expert explained, "The problem with the lighting conditions was the City of Los Angeles owned and maintained trees, which hung out over the roadway and contributed to shadows on the streets. These obscured the view of the lamps. The light from those lamps was also obscured as a vehicle traveled down southbound Overland. The problem with the leaves partially blocking the streetlight is it created spots and shadows at or near the intersection where the subject accident occurred. This is demonstrated in the photos attached to the Deposition of [the driver] as Exhibits 9-12 and his testimony regarding the shadows on the roadway. The result of the partial blockage of the light fixture is to cause dark spots in the area which contributes to drivers (*sic*) confusion in real time." The trial court sustained City's objections to these portions of the expert's declaration on the grounds they lacked foundation and were speculative.

We need not determine whether the court erred in these evidentiary rulings. Even if we consider this evidence, it does not create a disputed material fact that a dangerous condition existed due to the trees and foliage.

11

*Huerta v. City of Santa Ana* (2019) 39 Cal.App.5th 41 is instructive. According to the *Huerta* plaintiffs, the relative darkness caused by a tree casting a shadow at one end of a crosswalk created a peculiar condition that made it especially difficult for drivers to see pedestrians in that area. The plaintiffs relied on *Antenor v. City of L.A.* (1985) 174 Cal.App.3d 477, 483 (*Antenor*) to assert this peculiar condition placed a duty on the city to light the street in order to make the streets safe for travel. (*Huerta, supra,* at p. 50.)

The *Huerta* court found the tree and its shadow did not necessitate additional or different lighting under *Antenor*, especially since there was no evidence the tree blocked the driver's view of the crosswalk or anyone in it. (*Huerta, supra,* 39 Cal.App.5th at p. 50.) The *Huerta* court relied on the reasoning in *Mixon v. Pacific Gas & Electric Co.* (2012) 207 Cal.App.4th 124 (*Mixon*): "The lighting configuration at the subject intersection and surrounding area is not unlike many urban areas where there are numerous light sources, public and private, and gradations of light intensity. A public entity, which has no general duty to light its streets, cannot be held liable for failing to provide a consistent level of lighting between one street and the next." (*Huerta, supra*, at p. 51.) The *Huerta* court found the failure to light the entire crosswalk equally did not create a dangerous condition. (*Ibid.*)

We find this analysis apt. City is not liable for failing to provide a consistent level of lighting along Overland, especially when there is no evidence any of the trees or foliage blocked the driver's view of the crosswalk or anyone in it. The driver admitted he could see the crosswalk as he drove on Overland but it was "not prominent." He denied any of the trees blocked his

12

view of the street or the crosswalk.  Indeed, he testified he failed to see Rupasinghe only because she was a small woman, she wore dark clothing, and it was generally dark. He admitted he could not think of any other reason for his failure to see her.  Plaintiffs' expert did not address this testimony.  Given these facts, even considering the evidence the trial court excluded, *Huerta* and *Mixon* tell us a dangerous condition is not created from trees and foliage casting shadows.

### iii.    *Glare of Oncoming Vehicular Traffic*

Plaintiffs also contend the oncoming glare of headlights from northbound traffic forced the driver to focus on the road immediately ahead of him instead of 800 feet away, where the crosswalk is located.  This argument is meritless.

"Most obviously, a dangerous condition exists when public property is physically damaged, deteriorated, or defective in such a way as to foreseeably endanger those using the property itself. [Citations.]  But public property has also been considered to be in a dangerous condition 'because of the design or location of the improvement, the interrelationship of its structural or natural features, or the presence of latent hazards associated with its normal use.' " (*Bonanno, supra*, 30 Cal.4th at pp. 148–149, italics omitted.)  Plaintiffs fail to explain how lights from oncoming traffic, which the trial court accurately characterized as "a fact of life when driving," constitutes a latent hazard associated with the normal use of the Overland and Rose intersection.  In fact, the driver did not testify the lights from oncoming traffic caused his failure to see Rupasinghe in time. He instead testified he did not see Rupasinghe because she was small and wore dark clothing on a dark evening.

*iv.     Smart Crosswalk System*

Plaintiffs next argue the installation of a smart crosswalk system would have alleviated or minimized the dangerous condition at the intersection.  They rely on their expert's opinion and *Hurley v. County of Sonoma* (1984) 158 Cal.App.3d 281 for this proposition.[4]

The fatal flaw in plaintiffs' argument is that it assumes there exists a dangerous condition that a smart crosswalk system would eliminate or minimize.  But none of the factors identified by plaintiffs create a dangerous condition.  A smart crosswalk system was not required to alleviate a dangerous condition that did not exist.

*Hurley, supra*, 158 Cal.App.3d at page 286, relied upon by plaintiffs, is distinguishable.  In *Hurley,* the plaintiff's traffic engineer opined a guardrail would have minimized the injuries suffered by the plaintiff when he crashed into a concrete abutment.  The traffic engineer relied, in part, on a requirement in the State Traffic Manual that a guardrail be installed in similar places along state highways even though the accident occurred on a county highway.  (*Ibid.*)  Summary judgment was granted to the defendant.  The Court of Appeal reversed, finding "the proximity of the abutment to the highway, the slope of the highway, the absence of lighting and the possible lack of warning devices could combine to create a dangerous condition, given the foreseeability of vehicles, for a variety of reasons, straying off the road.  Respondent's traffic engineers declared three other single car accidents occurred in the general vicinity of appellant's

---

[4]     A smart crosswalk system is a series of flashing lights across the roadway that alerts a motorist to the presence of a pedestrian in the crosswalk.

14

accident when the cars went off the highway and struck an abutment. Respondent could therefore foresee injury occurring to occupants of a vehicle which collides with an abutment after leaving the highway, under the same or similar circumstances." (*Ibid.*)

*Hurley* does not stand for the proposition that the lack of guardrails contributed to the dangerous condition. Nor does it have anything to do with smart sidewalks. Instead, the dangerous condition in *Hurley* already existed and a guardrail would have eliminated or minimized the danger.

Plaintiffs' argument boils down to: a smart crosswalk system would make the intersection safer. That may be true but it does not establish government tort liability. "A public entity is not required to go beyond the elimination of danger and maximize every safety precaution." (*Mixon, supra*, 207 Cal.App.4th at p. 134.) "It has likewise been held that liability is not to be fastened upon a municipality merely because it may appear that certain property, in nowise dangerous either in its construction or intended use, could possibly be made safer by other means." (*Belcher v. San Francisco* (1945) 69 Cal.App.2d 457, 463.)

v.      *Combination of Factors*

Plaintiffs contend it is error to treat each factor individually. They claim the confluence of factors constituted a "trap," which resulted in a dangerous condition. (*Joyce v. Simi Valley Unified School Dist.* (2003) 110 Cal.App.4th 292; *Robinson v. Six Flags Theme Parks* (1998) 64 Cal.4th 1294, 1305.) While we agree in theory that a combination of factors may create a dangerous condition, plaintiffs have failed to demonstrate that this particular combination, along with the other undisputed facts in

15

this case, defeat City's showing that a dangerous condition does not exist as a matter of law.

**5.**    ***The Prior Accidents Do Not Demonstrate a Dangerous Condition***

Plaintiffs also claim the accident history at the Overland and Rose intersection is evidence of a dangerous condition because the facts of the prior accidents show there is a substantial risk of injury to individuals exercising due care while using the crosswalk.  We disagree.

It is well-settled that evidence of previous accidents may be admitted to prove the existence of a dangerous condition if the conditions under which the alleged previous accidents occurred were the same or substantially similar to the one in question. (*Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1072 (*Salas*).)  "While there must be substantial similarity to offer other accident evidence for any purpose, a stricter degree of substantial similarity is required when other accident evidence is offered to show a dangerous condition; ' "the other accident must be connected in some way with that thing. . . ." ' "  (*Id.* at p. 1072.)  In *Salas*, the court found no similarity between the prior accidents and the pedestrian accident of the type at issue because "none of the proffered accidents even involved a pedestrian, much less a pedestrian who stopped while crossing the street and then changed direction."  (*Ibid.*)

In *Mixon*, the court found two prior accidents to be dissimilar:  one occurred during daylight and the vehicle and pedestrian were at different locations of the intersection; the second involved a drunken pedestrian walking in front of a moving car.  (*Mixon, supra*, 207 Cal.App.4th at p. 138.)  The court found these accidents, even if admissible, did not establish a

16

dangerous condition "given the high traffic volume that has passed through the intersection without incident." It was undisputed that traffic volume at the intersection in *Mixon* was between 7700 and 9500 vehicles per day, 2.8 to 3.5 million vehicles per year, and 7.8 million vehicles in the five years before the accident. (*Ibid.*)

Likewise, it is undisputed there were three pedestrian-involved traffic collisions at the Overland and Rose intersection between 2009 and November 30, 2014.[5] On June 1, 2010, at 8:55 p.m., a vehicle traveling southbound on Overland unlawfully passed a vehicle stopped at the crosswalk and hit the pedestrian in the crosswalk. On February 16, 2013, at 1:35 a.m., the admittedly distracted driver of a vehicle driving southbound on Overland struck a pedestrian walking in the crosswalk. On May 21, 2013, at 4:35 p.m., a vehicle traveling southbound in the number one lane passed a stopped vehicle in the number two lane and struck a pedestrian who had begun to run in the crosswalk.

Leaving aside whether any of these prior accidents were sufficiently similar to the one involving Rupasinghe, it is undisputed that approximately 65 million vehicles and 1.2 million pedestrians passed through the same intersection without incident during that same five-year period. The facts here are strikingly similar to *Mixon* and we follow its reasoning to

---

[5] Plaintiffs also refer in their briefs to four prior accidents occurring between 2003 and 2014 at the intersection that involved pedestrians who were not properly in the crosswalk. Neither expert discussed these incidents, much less addressed how they were sufficiently similar to Rupasinghe's accident to be admissible. Accordingly, we do not consider them. (*Salas, supra*, 198 Cal.App.4th at p. 1072.)

17

conclude that as a matter of law the prior accident history at this intersection was not evidence of a dangerous condition.

Anticipating our conclusion, plaintiffs state the absence of previous accidents is not proof that a dangerous condition does not exist. (*Murphy v. County of Lake* (1951) 106 Cal.App.2d 61, 65.) We agree with that statement in concept, but the issue before us is whether there was affirmative evidence of a dangerous condition to create a triable issue of fact and overcome City's showing. The absence of all sorts of things is not evidence that a dangerous condition does not exist. More to the point, City does not rely solely on the lack of a significant accident history to argue the Overland and Rose intersection is not dangerous.

## 6. *The Subsequent Remedial Measures Were Inadmissible*

Lastly, plaintiffs argue the subsequent decision to install a safety warning light at the intersection should have been admitted to impeach City's expert's opinion that the intersection was not a dangerous condition. (*Love v. Wolf* (1967) 249 Cal.App.2d 822, 831.)

The record shows the trial court sustained City's objection to the evidence of subsequent remedial measures under Evidence Code section 1151. That statute provides: "When, after the occurrence of an event, remedial or precautionary measures are taken, which, if taken previously, would have tended to make the event less likely to occur, evidence of such subsequent measures is inadmissible to prove negligence or culpable conduct in connection with the event." (Evid. Code, § 1151.) The trial court did not abuse its discretion in excluding this evidence. (*Sanchez v. Bagues & Sons Mortuaries* (1969) 271 Cal.App.2d 188, 191–192 [subsequent remedial measure properly admitted into evidence

18

for impeachment only if the witness himself ordered the subsequent remedial measure].)

## DISPOSITION

The judgment is affirmed. City to recover its costs on appeal.

RUBIN, P. J.

WE CONCUR:

BAKER, J.

MOOR, J.